(63 South. 376.)

No. 19,538.

HOWCOTT v. TALEN et al.

(Oct. 20, 1913.   Rehearing Denied Nov. 17, 1913.)

*(Syllabus by the Court.)*

1. ACTION (§ 13*)—RIGHT OF ACTION—FRAUD.

The fact that, pursuant to a fraudulent conspiracy, titles to real estate are manufactured and inscribed in the conveyance office does not furnish a cause of action, in damages, against the conspirators, to a person not the owner of property affected by their acts.

[Ed. Note.—For other cases, see Action, Cent. Dig. §§ 76–83; Dec. Dig. § 13.*]

2. ACKNOWLEDGMENT (§ 48*) — LIABILITY — FRAUDULENT ACKNOWLEDGMENT.

If a notary public or other person knowingly co-operates in the manufacture and inscription in the conveyance office of fictitious and fraudulent titles to real estate, without the knowledge or consent of the owner, such notary or other person may no doubt be held liable in damages to such owner; but where a person appearing before a notary is identified by another person, known to the notary, and whom he has no reason to suspect of wrongdoing, the fact that the notary in good faith receives the acknowledgment of the person so appearing to an act of conveyance or other instrument does not subject him to liability for damages, though such person be not the person whom he was represented and believed to be.

[Ed. Note.—For other cases, see Acknowledgment, Cent. Dig. §§ 241–243; Dec. Dig. § 48.*]

3. CONSPIRACY (§ 13*)—FRAUD.

Where a person, through gross negligence or indifference to the consequences, permits himself to be inveigled into participating in the manufacture and inscription of acts purporting to dispose of real estate belonging to other people, he may be held liable for the resulting damages, even though he may be a victim, rather than a confederate, of the originator of the scheme.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. § 14; Dec. Dig. § 13.*]

Appeal from Civil District Court, Parish of Orleans; Fred D. King, Judge.

Action by William H. Howcott against C. G. W. Talen and others. From judgment for plaintiff, certain defendants appeal. Reversed.

Gustave Lemle, W. Catesby Jones, and A. A. Moreno, all of New Orleans, for appellant McGowan. S. F. Gautier, of New Orleans, for appellant Dearing. Wm. Winans Wall, of New Orleans, for appellee.

## Statement of the Case.

MONROE, J.   Plaintiff brings this suit against 11 named defendants, alleging that they, and others to him unknown, entered into a fraudulent conspiracy to incumber and to possess themselves of certain property belonging to him and to other persons, and, in furtherance of that purpose, caused proceedings to be taken purporting to open the succession of Edmund Josephson Moore and wife and to put their son and heir, Edmund Moore, in possession of such property, and caused to be executed and inscribed in the conveyance office pretended acts of sale thereof, by fictitious vendors, all of which is set out at length. He alleges that he has been damaged to the extent of $5,000 and prays for judgment awarding him that amount and ordering the cancellation of said fraudulent inscriptions.   There was judgment in the district court condemning eight of the defendants, as prayed, and rejecting plaintiff's demands as to three defendants. Two of the parties condemned (George W. Dearing, Jr., and James McGowan) have appealed. Plaintiff has not appealed nor asked for any amendment of the judgment.   The allegations of the petition descriptive of the property to which plaintiff claims title, of the title thus set up, and of the operations of the defendants, in so far as they are said to have been connected therewith, are as follows:

"That petitioner is the sole owner and, as such, has had possession, since February 4, 1904, of the following described property, to wit: A certain tract of land, situated in the Third district of New Orleans, La., in sections 19 and 30 of township 12 S. of range 12 E., designated as lot No. 3, on a plan by B. Buisson, surveyor, dated May 6, 1839, No. 63 of the Book of Plans of Theodore Guyol and Felix Grima, notaries public.   Said tract contains 19.30 acres."

It is then alleged that plaintiff acquired the property so described from Mrs. Marietta Soulé Denis, Mrs. Theresa Soulé Salgado, and Mrs. Angele Soulé Delcroix, who acquired it, by inheritance, from Pierre Soulé, who acquired it by virtue of a partition between John Slidell and others (including himself), who acquired it from Wm. C. Mylne, who acquired it from the government of the United States. It is further alleged:

"That if the existing streets of the city of New Orleans, in the vicinity of petitioner's said property, were prolonged, said property would comprise part of square 1605, bounded by Clouet, Montegut, and Industry streets and Florida walk; part of square 1696, bounded by Clouet, Montegut, Industry, and Agriculture streets; and part of square 1813, bounded by Clouet, Montegut, Abundance, and Agriculture streets."

It is then alleged that, in furtherance of their conspiracy, defendants caused a petition to be presented to the court, alleging that Edmund Josephson Moore and his wife, Rosina Moran, had departed this life, leaving one son and heir, Edmund Moore, and leaving an estate consisting of certain squares of ground in the Third district, including square No. 1605 bounded by Clouet, Montegut, and Industry streets and Florida walk; that a judgment was obtained purporting to send said Edmund Moore into possession of said property; that acts were then acknowledged and authenticated before the appellant Dearing, as notary, and witnessed by two of the defendants, who have not appealed, whereby Edmund Moore apparently conveys said property to another of the defendants, who executed an act purporting to convey it to the appellant McGowan, who executed an act purporting to convey it, with other squares, to another of the defendants. And it is then alleged that no such persons as Edmund Josephson Moore or his wife or son have ever existed, and that defendants knew it, etc. It is further alleged that an act was acknowledged before the appellant

Dearing, in the presence of the other defendants, whereby Edward J. Whindan apparently sold to the appellant McGowan the square No. 1813 (together with other squares), and that McGowan executed an act purporting to convey said square (with others) to another defendant. As to the square 1696, we find nothing further in the petition than the allegation that plaintiff acquired it, as stated, and now owns it.

## Opinion.

On the trial of the case, plaintiff offered in evidence the plan No. 63, referred to in the petition, which purports to have been the basis of a partition, made on June 4, 1839, between John Slidell, Pierre Soulé and others, and to show township 12 S. in range 12 E., with certain subdivisions, among which is one designated as "sections Nos. 19 and 30," containing nine lots, numbered from 1 to 9, inclusive. The act of partition was also offered and shows that Pierre Soulé acquired the lot 3, and an act of deposit by plaintiff, of date March 31, 1904, recites that by an act under private signature, duly acknowledged, of date February 19, 1904, Mesdames Marietta Soulé Denis, Angele Soulé Delcroix, and Theresa Soulé Saldago sold that lot to him. We, however, find nothing in the record which connects the title thus dealt with with that of Pierre Soulé. Moreover, plaintiff offered in evidence two blueprints, purporting to represent a part or parts of the property represented on plan No. 63 as though it were divided into squares, whereas, according to the evidence, it has never been actually so divided. Upon one of the blueprints, the only numbers that we find are 1 to 9, inclusive, indicating apparently the lots bearing those numbers according to plan 63. The other blueprint purports to give the numbers of the squares but not the numbers of the lots. Identifying the squares by the streets bounding them, and taking the

two blueprints together, we fail to find that either of the squares claimed by plaintiff is within the boundaries of the lot 63, which appears to cut through squares 1606, bounded by Clouet, Feliciana, and Industry streets and Florida walk, 1695, bounded by Clouet, Feliciana, Industry, and Agriculture streets, 1814, bounded by Clouet, Feliciana, Agriculture, and Abundance streets, and other squares, but does not touch squares 1605, .1696, or 1813, or either of them. And the impression thus created that those squares are not within the limits of lot 63 is strengthened by the oral testimony. Thus Mr. Bres, an expert, whom plaintiff employed and called as a witness, testified that all the maps that he had ever seen were a "little mixed" on the question of the boundaries of square 1605, and that he did not know whether it was bounded by Clouet, Montegut, and Industry streets and Florida walk, as alleged in the petition herein filed, or by Florida walk, Montegut, Feliciana, and Industry streets, as alleged in a petition filed by the Leader Realty Company against some of these same defendants; the fact being that, according to the blueprints to which we have referred, square 1605 is bounded by Florida walk, Montegut, Feliciana, and Industry streets. Plaintiff's own counsel, being on the stand, gave the following testimony on the cross-examination, to wit:

"Q. Well, Mr. Wall, in the judgment which was rendered in the Leader Realty Company Case, I see that the same number of squares have been recovered by the Leader Realty Company that you claim in this suit; now, who is the owner of those properties, Mr. Howcott or the Leader Realty Company? A. I don't know; I think it is a question for the court to resolve, in considering the case, and for that reason I am forced to object to answering you. Q. But. Mr. Wall, you appeared as attorney in the Leader Case? A. Why, certainly. Q. You answered it in that case? A. But I don't undertake to decide this case."

[1-3] We are therefore of opinion that plaintiff fails to disclose any such interest in the property which was affected by the operations of the defendants as to entitle him to recover in this suit. But, even if he had shown title to the squares claimed by him, we do not think that the judgment against the defendants who have appealed could be affirmed. The evidence shows that beyond doubt there was a fraudulent conspiracy, in furtherance of which the parties thereto caused proceedings to be instituted, purporting to open the successions of persons who never existed and resulting in the obtention of judgments, purporting to put the fictitious heirs of such fictitious persons in possession of quite a good many pieces of real estate, and that real persons, representing such fictitious heirs, then executed acts purporting to sell the property, and that in other instances, without the opening of any successions, persons were introduced to prospective buyers and to notaries as the owners of certain real estate, to which they had no pretense of title, and acts of sale signed by them, and sometimes witnessed by other of the conspirators, were authenticated by the notaries; but the evidence fails to satisfy us that the appellant Dearing, who was one of the notaries referred to, or the appellant McGowan, who was one of the buyers, were parties to the conspiracy. The inventor apparently and main actor in the whole business was Felix H. Boulmay, who necessarily required the co-operation of a number of persons, but such co-operation, though guilty in some instances, was innocent in others. A number of witnesses testified that they had known Boulmay for many years, and there was no attempt to show that he was disreputable or for any reason a person with whom ordinary business might not be transacted in the ordinary way. When, therefore, he professed to have discovered the heir to land lying out in what until recently has been a swamp and assessed to "unknown owners," and himself, with a milkman, known to the attorney and notary to whom

he presented himself, made the necessary affidavits, it is not altogether surprising that the attorney and notary should have taken the steps required to put the supposed heir in possession of his supposed estate; and the fact that, in the course of his operations, Boulmay employed a half dozen notaries or more, and that none of them appear to have received more than the ordinary fees, indicates that, though in some instances not as prudent as they might have been, they were the victims, rather than the confederates, of their client. The charges against Dearing are: That he received an acknowledgment purporting to be that of Edmund Moore, the fictitious heir, and of Leo. J. Sapera, a son-in-law of Boulmay, to an act of sale, under private signature, whereby the supposed Moore sold to Sapera several squares, including square 1605; that he received an acknowledgment purporting to be that of Edward J. Whindan, a fictitious person, and of the appellant McGowan, to an act of sale, under private signature; that he received an affidavit, purporting to be that of the pretended Edmund Moore, and the acknowledgment of two real persons to an act of sale, under private signature, affecting property to which neither of them had any title. The evidence is entirely uncontradicted to the effect that Boulmay had once been a notary public and that Dearing had known him for 20 years; that he brought to Dearing's office two men whom he introduced, the one as Moore and the other as Sapera, his son-in-law (which he was); that Dearing received their acknowledgments to an instrument which, having previously been prepared, was signed by the parties and by Boulmay and Dearing's son as witnesses; that on another occasion Boulmay brought a man, whom he introduced as Whindan, with an instrument, already prepared, purporting to be an act of sale from Whindan to McGowan, informing Dearing that Mc-

Gowan, whom Dearing knew, would come in later, which he did, and that Dearing received the acknowledgments of their signatures, witnessed by Boulmay and a man named Perrett, whom Dearing knew; that the affidavit of the pretended Edmund Moore, to which Dearing affixed the jurat, is appended to a supplemental petition, signed by a reputable attorney and notary, purporting to correct an error in the proceedings which he had been deceived into instituting in the pseudo succession of Edmund Josephson Moore and wife; that some one personating Edmund Moore had signed the affidavit; and that he received the acknowledgments of the signatures to the other instrument by the persons who put them there and who testified in the case—in all of which we find nothing unusual or which reflects upon the good faith of Dearing. If a notary public knowingly participates in the confection and the inscription in the conveyance or mortgage office of an instrument incumbering the title to real estate, without the knowledge or consent of the owner, he is no doubt liable to the owner in damages for the consequences of his fault; but it can hardly be expected that he will ordinarily require more than the reasonable identification of persons who come before him merely to acknowledge their signatures to instruments of any kind. He most assuredly is not obliged to examine the titles of the property which the instruments purport to affect or to verify the truth of the affidavits which the parties propose to sign. In fact, so long as he exercises the precaution of an ordinarily prudent business man in certifying to the identity of the persons who appear before him, it may be doubted whether he has any other function to discharge; and we are of opinion that such precaution was exercised by Dearing in the matters here complained of.

McGowan's case is not so clear, since he

was guilty of gross negligence in accepting, conveying, and placing on record titles to property which belonged to others, merely upon the faith of Boulmay's representations. Precisely what those representations were the record does not show, but we infer that McGowan was told that Boulmay had found a number of outlying squares of ground that were assessed to "unknown owners" (which was a fact); that he had discovered the owners; and that the property might be bought at a low price; but that it would require some money, possibly, to pay back taxes and clear up the titles, etc.; and McGowan appears to have furnished the money and to have accepted Boulmay's assurances as to his disposition of it and as to the character of the titles that he was to acquire. His credulity is shown to have cost him something like $5,000, and his negligence would perhaps cost him something more, if the plaintiff in this case had shown that his property was affected by McGowan's operations, even though we do not find that the evidence adduced convicts McGowan of fraud. He was rather the victim, as we take it, of Boulmay than his confederate; and, so far as we can see, he inflicted no injury on the plaintiff, whose misapprehension in regard to his own titles was a matter for which McGowan was not responsible.

There is some suggestion, in the brief of McGowan's counsel, to the effect that the judgment appealed from is erroneous in ordering the cancellation of the inscriptions of titles to property in which the plaintiff has no interest, and that may be true; but McGowan has no more interest in the property than has the plaintiff, and we see no reason why the judgment, though erroneous, should be disturbed on that account, at his instance. In so far, then, as the judgment appealed from condemns the defendants George W. Dearing, Jr., and James McGowan to pay plaintiff the sum of $5,000, with interest and costs, it is ordered, adjudged, and decreed that the same be annulled and set aside. It is further decreed that plaintiff's demand therefor be rejected at his cost in both courts.