Statement of the Case.
MONROE, C. J.
This case comes up on appeal from a judgment rejecting plaintiff’s demand for damages for injury and suffering resulting from the bite of a dog alleged to have been the property of defendant, and a vicious brute, to the knowledge of defendant’s officers. Defendant admits that plaintiff was bitten by the dog, and at the time and place stated in the petition, but denies ownership of the animal, or liability with respect to it; also denies that it was vicious, or, if vicious, that it (defendant) was aware of that fact. It “admits that said dog was born and reared, and stayed, on the premises of your respondent, * * * but denies that it was either born or kept on the said premises with the knowledge and consent of your respondent or of any of its agents who had authority to keep the said dog on its premises.”
We find from the evidence that defendant’s business is divided into departments, and that a competent man is placed in charge of each department; that the bottling department is situated on Bienville, between Royal and Bourbon streets, and at, and pri- or to, the occurrence here in question was in charge of Charles Cortie, as foreman, and Charlie Pelletier as assistant foreman; that probably, early in 1911, a female dog strayed into those premises, and with the knowledge and consent of Mr. Cortie was there harbored, and thereafter gave birth to a litter of puppies, one of which was retained by Mr. Cortie, or with Ms knowledge and consent, and on February 23, 1913, having followed Mr. Pelletier into an adjoiMng barroom, there inflicted the bite upon plaintiff of which he here complains. There are several witnesses who give their opinions as to the age of the animal at that time— their estimates ranging from 3 or 4 to 18 months — but as Mr. Pelletier’s relations with it appear to have been rather closer than. *293 those of the others, we accept his statement that it was about a year old. It appears to have been a mongrel with a predominating dachshund strain, and the fact that it was small probably accounts for the impression, created in the minds of some of the witnesses, that it was younger than it was said to be by Pelletier, whom, with its mother, it was in the habit of following every morning from the bottling plant into the barroom. Cortie testifies that he made daily reports of matters in the bottling plant, but did not report the dogs; that the officers of the company came there about once in 6 months on inspections, but did not inspect; that the secretary and treasurer had an office there in which he spent 10 or 15 minutes every day, but never went into the bottling works; that the mother of the dog in question was a good little thing, full of play, and a pretty good ratter, and that “the boys used to give it their scraps of food from their lunches,” a benevolence which was extended to her offspring. Mr. Cortie also gives some testimony, as do other witnesses, to the effect that both animals were in the habit of visiting other places, such as the Cosmopolitan Hotel and Pabacher’s restaurant, where food was to be obtained, which was natural enough, in view of the fact that they could, apparently, depend upon the bottling plant for but one meal a day, and found it necessary to breakfast and dine elsewhere, and may also account for their early visits 'to the barroom. Mr. Cortie further testifies that he never heard that the dog in question had bitten any one before it bit plaintiff, but he does not say, as he said of the mother, that it was “a good little thing, full of play,” nor was any attempt made by defendant to show that it was gentle or amiable. Mr. Cortie accompanied the dog to a veterinary hospital after it had bitten plaintiff, and testifies that it died two days later, and, although the plain inference is that it | died of hydrophobia, or was put to death because found suffering with that disease, plaintiffs testimony as to what Pelletier and the “fellow” at the hospital told him on that subject, and which inspired him to go at once to the Charity Hospital and take the Pasteur treatment, was excluded on defendant’s objection as hearsay. Concerning his position and authority, Mr. Cortie gives the following testimony:
“I was foreman of the mechanical equipment. Q. Was anybody above you on the premises? A. No, sir. Q, You had charge of the premises? A. I had charge of the mechanical equipment, part of it; yes, sir. Q. Was there anybody on the premises who could tell you what to do? A. No, sir. Q. Who did you report to, if anybody? A. I reported daily to the main office.”
Mr. Schlieder, the president of the company, being asked how often he inspected the bottling department, replied: “Sometimes I don’t go there for a long while; two or three months, at intervals”- — -to which he adds that he goes in, or looks in, more frequently, “in passing”; that Mr. Cortie had charge of that department, under his supervision; that Mr. Owen could have given him orders, also Mr. Boulet. Mr. Schlieder differs from the other witnesses called by defendant in that they speak of a multiplicity of dogs that frequented the brewery, while he was unable to remember that he had seen any. Mr. Owen’s name is not elsewhere mentioned, and we are not informed whether he ever visited the bottling department, or whether the orders that he could give were those which related to the bottling of the beer, its shipment, or what not. Mr. Boulet was the secretary and treasurer (to whom we have already referred), who never went into the bottling works, though he had an office on the premises, and he testifies that he saw various dogs about the place, and was able to recall the dog here in question and the mother, but that he had paid no attention to any of them; that defendant never owned *295 a dog, and that none were kept at the brewery with his knowledge and consent. .
Plaintiff is a barber, whose shop is next door (on Bourbon street) to the barroom, known as the “Old Absinthe House,” which stands on the corner of Bourbon and Bienville streets, and is next, on the Bienville street side, to defendant’s bottling plant. Another barber was also working in the shop, and as he and plaintiff did not always arrive at the same moment in the morning it was the custom to leave the key of the shop in the barroom. On the morning of February 23, 1913, plaintiff,- being the first to arrive, went into the barroom to get the key, and found there Jacynthe Ferrer, the bartender, Mr. Pelletier, defendant’s assistant foreman, and the dog here in question, and he tells what then happened (not having entire command of the English language) as follows;
“I opened the door of the Old Absinthe House to got the' key, * * * and as soon as I opened the door * * * the dog make a jump at me, as if to bite my legs, and as soon as I turn around to skiddoo him with my hands he bite me on the hand. * * * Well ho tried to bite me then when I rushed in, and I told him to skiddoo, and then he jumped up and bit me on the hand. He got my pants first, but he didn’t get the skin; just bit in the pants. * * * I never played with the dog. Q. You never did play with this dog? A. No, sir; never played with him.”
Jacynthe Ferrer testifies that the dog lived in the bottling department of defendant’s brewery, and further as follows:
“Well, one morning, Mr. Serio came there [to the Old Absinthe House] between a quarter to 7 and 7 o’clock, and entered the bar, and as he entered the bar Mr. Pelletier was in there with a couple of dogs, and the dogs started for Mr. Serio, and he started to drive them off, and one of them jumped up and bit him on the hand. Q. Who did those dogs come in that place with? A. They used to come there with the assistant foreman of the American Brewing Company. Q. Did they come in there with him that morning? A. Yes, sir; and most every morning they used to come there.”
Pelletier’s account of the bite is about the same; he says:
“Well, like I said before, when I went down then the dog followed mo and wont behind the counter, and then he came out again, and Mr. Serio was coming in the place, and he grabbed him and'bit him on the hand. Q. Did Mr. Serio do anything to the dog to make him bite him? A. No, sir; he did not. Q. Not a thing? A. Not a thing; no-, sir.”
Felix Ferrier, manager of the saloon, says, in his testimony, that he always considered the dog vicious; that he saw him snap at many persons, and had to take his walking stick (to him) when Pelletier would bring him in; that everybody seemed to fear him.
Joseph Warner, a manufacturing jeweler, with a place of business on Bourbon street, around the corner from the bottling works, testifies that he had occasion to pass those works every day, and several times a day; that every time he passed, “pretty much,” the dog would run out at him, and on one occasion caught him “by the pants”; that he was in such dread of him that before he reached the place he would think of him and he very careful, because he considered him dangerous; that he became familiar with him by seeing him from the time he was a puppy in the entrance on the inside of the brewery, and judged that he was about a year and a half old when he hit plaintiff.
William Wagner, who has been working on Bourbon street, also around the corner from the bottling plant, testifies that he was in the habit of passing the plant between two and seven times a day; that the dog would occasionally run after and bark at him; and that he would go out into the street, cross to the opposite banquette, in order to avoid him, not caring to wait and find out whether he would bite.
Plaintiff continued at work until Sunday morning (following the preceding Friday, when he was bitten), and then upon the information furnished him by Pelletier and the veterinarian to the effect, we assume, that the dog was dead (though he was not allowed to say what had been told him), he *297 went to the Charity Hospital, where he was subjected to the Pasteur treatment for the prevention of hydrophobia, consisting of daily hypodermic injections, about the abdomen, during a period of 21 days, a treatment which is shown to have been exceedingly painful, and from the after effects of which upon his nervous system he was very slow in recovering. His pecuniary loss was perhaps less than $100.
Opinion.
As we have stated, defendant “admits that the said dog was born and reared on the premises of your respondent, * * * but * * * denies that the said dog was either born or kept on said premises with the knowledge of your respondent or any o£ its agents who had authority to keep the said dog on its premises.”
[1] It is hardly to have been expected that defendant’s entire corporate authority would have been invoked, or even that a resolution of its board of directors would have been considered necessary to authorize the keeping of a dog in its bottling lflant, whether to kill rats, or as a mascot, or source of amusement to the employés, but those vested with the corporate authority were bound to know that a dog so kept, with the knowledge and approval of the agent whom they had placed in charge of the plant, was a dangerous animal, which threatened injury to innocent people, and the fact that they chose to close their eyes to that condition is not a good defense to an action in damages by a person who without fault on his part was bitten by the dog. A person is responsible not only for the damage occasioned by his own act, but for that which is caused by the acts of those for whom he is answerable, and for the things which he has in his custody. G. C. 2317, 2321. In the matter of the liability of corporations for the acts of their agents, whether of omission or commission, which inflict injury upon others:
[3-5] Knowledge acquired by the agent in transacting the business of the corporation will be imputed to the corporation. Antrim Lumber Co. v. Bolinger & Co., 121 La. 312, 46 South. 337; Hall & Brown Co. v. Haley Furniture & M. Co., 174 Ala. 190, 56 South. 726. A corporation, like a natural person, is liable for the tort of its agent, when acting within the scope, or apparent scope, of the authority conferred on him. Gann v. Great Southern Lumber Co., 131 La. 400, 59 South. 830. One who harbors a dangerous animal on his premises, or keeps there anything likely to do mischief, does so- at his peril, and is answerable for all damages which result from its escape. Vredenburg v. Behan, 35 La. Ann. 639. The owner is bound to know the condition of his property. Tucker v. Railroad Co., 42 La. Ann. 114, 7 South. 124. Negligent ignorance is equivalent to actual knowledge. Lorenz v. City of New Orleans, 114 La. 804, 805, 38 South. 566. In Bentz v. Page, 115 La. 560, 39 South. 599, being an action in damages resulting from the bite of a dog, inflicted while plaintiff was passing on a public thoroughfare, it was held, quoting from the syllabus:
“It was necessary for defendant to show that the animal had always been of a kind temper, had never attempted to bite any one, and had never given occasion to suspect that he would bite; and, failing to do so, the law presumes that the defendant was in fault in not confining the animal, which was a strange dog, to the premises.”
Other decisions, to the effect that a corporation which permits a dog to remain upon its premises and be fed by its employes is liable as a harborer, are cited in the note to Holmes v. Murray (Mo.) 17 L. R. A. (N. S.) 431, and include Barrett v. Malden & Melrose R. Co., 3 Allen (Mass.) 101, Chicago & Alton *299 R. Co. v. Kuckkuck, 197 Ill. 308, 64 N. E. 358, and Keenan v. Gutta Percha & Rubber Mfg. Co., 46 Hun (N. Y.) 544, affirmed in 120 N. Y. 627, 24 N. E. 1096.
[2, 6] In considering the question of the damages to be allowed we leave out of view the claim for punitive damages, as we have recently held that such damages are not authorized in civil actions. See Vincent v. Morgan & Co. (lately decided) 74 South. 541.[1] Included, however, in the actual damages that plaintiff is entitled to recover, and which, under C. C. 1934, No. 5, the court is authorized to assess, are not only those required to compensate the physical suffering to which he was subjected in the administration of the Pasteur treatment, but also those required to compensate the mental suffering resulting from the knowledge that he had been bitten by a mad dog, and that (as shown by the evidence) until after the expiration of 100 days he could not be sure that he was safe from hydrophobia; and there are likewise included such damages as will compensate his suffering from the protracted effect of the Pasteur treatment upon his nervous system. Taking those different factors into account, with his pecuniary loss and with the diminished purchasing power of money, we assess the damages at $1,000.
It is therefore ordered that the judgment appealed from be set aside, and that there be judgment in favor of the plaintiff, John Serio, and against the defendant, the American Brewing Company, in the sum of $1,000, with legal interest thereon from the date at which this judgment shall become final, and all costs.
SOMMERVILLE, J., concurs. O’NIELL, J., considers the amount of the judgment excessive, but otherwise concurs.

 140 La. 1027.