EQUILEASE CORPORATION,
Plaintiff-Appellant,

v.

SMITH INTERNATIONAL, INC., et al.,
Defendants-Appellees.

No. 76–3732.

United States Court of Appeals,
Fifth Circuit.

Jan. 29, 1979.

920

Jacob J. Meyer, Louis J. Dutrey, New Orleans, La., for plaintiff-appellant.

Gordon F. Wilson, Jr., Douglas S. Draper, New Orleans, La., for Smith Intern., Inc.

Before WISDOM, GOLDBERG and RUBIN, Circuit Judges.

WISDOM, Circuit Judge:

This diversity case raises a slippery question of Louisiana law concerning application of the principle of "negligent ignorance" to one who contributes to the success of a fraudulent scheme without actual knowledge of the fraud. The district court held that Louisiana law does not countenance imposition of liability on a party who had no actual knowledge of fraud but that, in any event, the defendant was not negligently ignorant. Although we reserve

judgment on the question whether in Louisiana negligent ignorance can substitute for actual knowledge in a suit based on the defendant's assisting the commission of a fraud, we agree with the district court that the principle of negligent ignorance cannot be applied in this case. Accordingly, we affirm.

## I

The primary "defendant", Drilco Oil Tools, Inc.,[1] located in Midland, Texas, manufactures drill pipe for oil and gas exploration. Drilco sells its pipe to leasing companies which then lease the pipe to oil drillers. In 1972, Drilco sold 450 joints of used drill pipe to Dril-Wate, Inc. Dril-Wate financed this purchase, in the customary manner in the oil equipment business, by selling the pipe to Liberty Leasing Co., which was engaged in the business of financing equipment leases. Liberty then leased it back to Dril-Wate. Dril-Wate intended to rent the drill pipe to oil prospectors and use this second lease to secure its lease from Liberty.

In early 1972, Dril-Wate's rental business was adversely affected by the opposition of environmentalists to drilling in offshore Louisiana and to laying the Alaska Pipeline. Prospectors, fearing that the drilling would be halted by the government, ceased to lease expensive equipment. Because Dril-Wate was deprived of its rental income, it desperately needed refinancing to meet the debt owed to Liberty Leasing and to other creditors, including Drilco. Liberty Leasing put Dril-Wate in touch with First Leasing and Capitol Corp., an independent lease-broker for various companies financing equipment leases including the plaintiff in this case, Equilease Corp., a New York corporation. To Dril-Wate's relief, First Leasing offered to purchase the Dril-Wate lease

of pipe from Liberty Leasing, on behalf of an undisclosed backer, Equilease.

The district court found that there was a conspiracy involving Robert Ryland of Liberty Leasing of Alaska, Thomas Growden of Dril-Wate of Alaska and Dril-Wate of Louisiana, and James Perdue of First Leasing of Memphis. Ryland's incentive was to obtain payment for money Dril-Wate owed Liberty Leasing and to receive a finder's fee. Growden needed financing for his drill pipe leasing business. Perdue wanted to obtain the commission and prestige of a large oil field leasing transaction with his new source of funds, Equilease.

To induce Equilease to purchase the lease, Dril-Wate, through Growden, and First Leasing, through Perdue, embarked on the first of several fraudulent transactions which are the stuff of this appeal. First, the conspirators represented that the lease covered 550 joints of new pipe, when the pipe consisted of 450 joints of old pipe. To accomplish this deceit, they forged six Drilco invoices for the pipe. The copies were exact duplicates of real Drilco invoices in Dril-Wate's possession with the exception that the copies were undated. Although Equilease was interested in the proposed purchase, the proposal seemed risky. Equilease asked First Leasing to arrange security for the purchase by obtaining a dealer-recourse agreement that would obligate Drilco to repurchase the equipment from Equilease if Dril-Wate defaulted on the loan. Dril-Wate met this condition by forging a letter of agreement on blank Drilco stationery and signing the name of a Drilco corporate officer, Glenn Chance, with whom Equilease had dealt in the past. Later, Dril-Wate drafted a Drilco corporate resolution authorizing the dealer-recourse agreement as well as a Drilco certificate attest-

1. Drilco is a division of Smith International, Inc., a California corporation that is a named defendant in the complaint. In this opinion Smith International, Drilco Division, is referred to as Drilco. The other defendants are Dril-Wate, Inc., a Louisiana corporation, A. Thomas Growden and his wife, Joel H. Growden, Louisiana, citizens and Dril-Wate's principal shareholders; First Leasing and Capitol Corporation,

an Arkansas corporation doing business in Tennessee at times material herein; James H. Perdue, Jr., a Tennessee resident who, as First Leasing's officer-shareholder, acted on the corporation's behalf in the matters herein; Liberty Leasing Co. of Alaska, Inc.; and Robert Ryland, who, at times material herein, was a resident of Alaska and Liberty Leasing's principal stockholder.

ing to the authenticity of the corporate resolution. The certificate bore the forged signature of E. L. Cory. In fact, the Secretary-Treasurer of Smith International, the parent company of Drilco, was P. E. Cory. Equilease accepted the authenticity of the documents despite the discrepancy in the initials on the forged Cory signature and despite the fact that the forged signature of Glenn Chance varied from his authentic signature on letters in Equilease's possession.

Indeed, the scheme might never have been uncovered had not Equilease insisted upon paying Drilco directly for the pipe. To keep secret the identity of the financial backer, First Leasing proposed that it write the check to Drilco reflecting the cost of the 550 joints of new pipe and that Equilease cover the check by wiring funds to First Leasing's Memphis bank account.

Meanwhile, the conspirators laid the groundwork for disgorging the money that would be sent to Drilco. Dril-Wate informed Drilco's credit and sales manager, Ted White, that Dril-Wate would be able to pay its $90,386.30 debt to Drilco within 20 days because Liberty Leasing had agreed to refinance the lease on the pipe. Later, Dril-Wate informed Ted White that it would shortly receive a check that was supposedly the product of the Liberty Leasing refinancing. Drilco was requested to deduct the Drilco debt from the check and forward the remainder to Dril-Wate's bank in Gretna, Louisiana. Neither Growden nor Ryland revealed to White the amount of the check, probably because a large sum might arouse suspicions. Growden spoke to Ted White's assistant, Melba McCormick, and reassured her about the transaction.

Equilease mailed the First Leasing check, dated June 23, as planned, enclosing only the forged undated invoices. Because the check was delayed and Dril-Wate was pressed for money, it asked First Leasing to wire the money to Drilco. Growden also called Ted White to inform him that a wire was on the way. White had started on his vacation on June 30 but he left a memo with Melba McCormick instructing her to release a check to Dril-Wate immediately if Drilco received a Liberty Leasing money wire. If Liberty Leasing sent a check, she was to wait at least 10 days for the check to clear. On July 6, Drilco received a money wire of $494,150 from First Leasing. Although surprised at the amount of the wire, McCormick followed her instructions. On that day, the Commercial Bank credited $90,386.30 to Drilco's account with a notation earmarking the balance of $403,763.70 for Dril-Wate's account. The excess funds were actually forwarded upon Drilco's instructions on the following day, July 7.

The wayward check for $494,150 together with the invoices arrived, most probably, according to the district court, on July 6. Although McCormick was advised by Drilco's comptroller to send the check back to the payor, she decided to keep it to show it to White. There was testimony at the trial indicating that McCormick knew that Growden was a "wheeler-dealer" and suspected something was awry. When White returned on July 10, he immediately recognized that the invoices were forged. Although McCormick was also familiar with Drilco invoices, she testified that she did not examine the invoices since she expected that they would be returned with the check. White also discovered then that it was First Leasing rather than Liberty Leasing which had financed the transaction.

White called Growden demanding an explanation for the forged invoices and the exceedingly large amount of excess money. Growden reassured him that the invoices contained Dril-Wate's serial numbers and were used by Dril-Wate for its accounting purposes. As for the money, Dril-Wate stated that he had to refund (kick back) about $189,000 to First Leasing. At trial, White testified that he suspected there was some sort of kick-back scheme between First Leasing and Dril-Wate but that he had no concrete basis for accusing Dril-Wate of wrongdoing. Moreover, he felt that there was little he could do because the excess funds had already been wired to Dril-Wate.

Equilease did not discover the fraud until sometime in 1973 after a second fraudulent lease transaction was arranged.[2] By this time, Dril-Wate had disbursed all of the plaintiff's funds and was bankrupt. The trial court found· that Drilco too was deceived and remained so until White saw the checks and invoices.

In the district court, Equilease sued Dril-Wate, First Leasing, Liberty Leasing, Drilco, and the individual conspirators, Ryland, Perdue, and Growden. The court entered judgment against all these defendants, except Drilco, holding them liable in solido to the plaintiff under Articles 2315 and 1847. The court dismissed certain cross-claims, and rendered judgment in favor of Drilco and against Equilease, dismissing Equilease's action against Drilco. Equilease, understandably eager to recover from the only solvent defendant, had urged two theories of recovery from Drilco, one delictual (Article 2324) the other quasi-contractual (Article 2301): (1) assisting in or encouraging the fraudulent scheme devised by Dril-Wate, First Leasing, and Liberty Leasing and (2) unjust enrichment. The district court rejected both theories and entered judgment in favor of Drilco. Equilease appeals from this judgment.

2. The second transaction substantially duplicated the first one. Although Drilco was indirectly involved in that transaction, too, Equilease conceded in the district court that it has no grounds for recovery against Drilco on the basis of the second transaction.

3. The district court applied Louisiana law, even though the parties are domiciled in five different states and the lease-purchase agreements executed between Equilease and First Leasing provided that "all matters in any way related to" the agreement shall be governed by New York law. The court concluded that the contract language did not affect the multi-party and primarily delictual situation in this case. Louisiana, as the forum and the state in which the fraudulently obtained funds were actually deposited, has the most significant contacts with the parties and the occurrence. See Memorandum Opinion of May 19, 1975. Although Drilco contested the application of Louisiana law in the district court, it has abandoned its objection on appeal. We agree that, in the circumstances of this case, the district court was correct in applying Louisiana law. See Brinkley & West, Inc. v. Foremost Insurance Co., 5 Cir. 1974, 449 F.2d 928, 932–33; Jagers

II

In Louisiana[3] tort law, each person who joins in committing a wrong is liable in solido (jointly and severally) to the injured party for all damages sustained. This principle is expressed in Article 2324 of the Louisiana Civil Code:

He who causes another person to do an unlawful act, or assists or encourages in the commission of it, is answerable in solido, with that person for the damage caused by such act.

Liability in solido ordinarily results when tortfeasors cooperate in a joint venture to cause harm. Rush v. Town of Farmerville, 1924, 156 La. 857, 101 So. 243. It can also be imposed upon persons who are strangers to each other but who have each contributed to bringing about the same wrong, as in the case of concurrently yet independently negligent actors. Reeves v. Louisiana & A. Ry. Co., La.Sup.Ct.1973, 282 So.2d 503, La. App., on remand, 304 So.2d 370.

Although Drilco is not individually liable for fraud under Louisiana jurisprudence because there is no evidence that it intended to deceive,[4] Equilease argues that, by virtue of Article 2324, Drilco is, nonetheless, an-

v. Royal Indemnity Co., La.Sup.Ct.1973, 276 So.2d 309.

4. The definition of legal fraud is expressed in Article 1847 of the Civil Code, which discusses the rescission of contracts:

The cause of an error . . . created or continued by artifice, with design to obtain some unjust advantages to the one party, or to cause an inconvenience or loss to the other.

Because charges of fraud carry an almost criminal connotation in Louisiana, the jurisprudence has interpreted the language of this provision with great strictness. There must be an intention to defraud causing damage to the victim. Both elements must be proved by clear and convincing evidence. Armstrong v. Copeland, La.App.1967, 194 So.2d 801.

Delictual recovery for fraud is provided for in Article 2315, the general tort provision of the Civil Code:

"Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."

The jurisprudence surrounding fraud under Article 1847 is carried over to the delictual action.

swerable for the damage that resulted from the fraud. Equilease offers two separate theories for application of solidary liability. If the defendant knew of the fraudulent scheme and contributed to its success by transferring the funds of Equilease to Dril-Wate, it should be treated as having cooperated in the joint venture to commit fraud. Equilease admits that Drilco did not actually know that the transaction was fraudulent. But the plaintiff insists that knowledge must be imputed to Drilco as a matter of law, according to the Louisiana doctrine of negligent ignorance, because Drilco's actual knowledge of suspicious circumstances obligated it to investigate and discover the fraud.

In the alternative, the plaintiff points out that Drilco acted recklessly or negligently by agreeing to transfer the funds and by refraining from notifying the authorities or reversing the money wire even though it suspected wrongdoing. Although, so the argument runs, Drilco may have had no knowledge of the conspiracy at all, and although its fault differs in kind from those who devised the scheme, it assisted in bringing about the same wrong and is, therefore, liable *in solido* with those who intentionally committed the fraud.

We address first the plaintiff's contention that the district court misinterpreted the principle of negligent ignorance and erred in concluding that the Louisiana courts do not apply this principle in actions for deceit. We then consider whether Drilco was liable *in solido* for reckless or negligent participation in the fraud.

### III

A. A threshold problem is whether "negligent ignorance" is a theory of negligence or notice.

■ Unhappily, the doctrine of negligent ignorance does not fall neatly into one category. Counsel for the litigants and our research show no specific civilian heritage or analogue for this doctrine. Louisiana borrowed the name and the substance of this principle from the common law. At common law, negligent ignorance refers to the standard of knowledge that an actor must possess to exercise reasonable care. Thus, Prosser states:

"The individual may, however, know enough to be conscious of his own ignorance and of possible danger into which it may lead him, and if that is the case, as where a layman attempts to give medical treatment . . . he will be found negligent in proceeding in the face of known ignorance. He may, furthermore, be engaged in an activity or stand in a relation to others which imposes upon him an obligation to investigate and find out, so that he becomes liable not so much for being ignorant, but for remaining ignorant; and this obligation may require him to know at least enough to conduct an intelligent inquiry as to what he does not know. The occupier of business premises who invites business visitors to enter, the landlord who installs a gas heater in the bathroom used by his tenants, . . . all are charged with the duty of affirmative action which would be taken by a reasonable man in their position to discover dangers of which they may not be informed. As scientific knowledge advances . . . what was excusable ignorance yesterday becomes negligent ignorance today."

W. Prosser, Torts (4th Ed.) pp. 160–161.[5]

Most Louisiana cases which discuss the term "negligent ignorance" are concerned with this tort duty of care.[6] For example, an affirmative duty to possess knowledge has been imposed on a municipal corporation for the protection of the public, *Lorenz v. City of New Orleans,* 1905, 114 La. 802, 38 So. 566; on a possessor of land who invites business visitors to enter, *Atkins v. Bush,* 1917, 141 La. 180, 74 So. 897; and on the owner of dangerous instrumentalities,

---

5. *See also* Restatement (Second) of Torts, § 289, Comment j; Note, Minimum Standard of Knowledge—Duty to Know, 23 Minn.L.Rev. 628 (1939).

6. We consider whether Drilco may be liable for negligence in Part IV of this opinion.

such as a vicious dog, *Serio v. American Brewing Company,* 1917, 141 La. 290, 74 So. 998.

Equilease maintains, however, that Louisiana cases have also borrowed, under the heading of negligent ignorance, the common law device of imputing knowledge. An early Louisiana case, *Dugas v. Powell,* 1945, 207 La. 316, 339, 21 So.2d 366, 373, quotes approvingly the following passage from Ruling Case Law, Vol. 20, Notice § 7:

> "Whatever fairly puts a person on inquiry is sufficient notice, where the means of knowledge are at hand; and if he omits to inquire, he is then chargeable with all the facts which, by a proper inquiry, he might have ascertained. Means of knowledge with the duty of using them are, in equity, equivalent to knowledge itself. *Where there is a duty of finding out and knowing,* negligent ignorance has the same effect in law as actual knowledge." (Emphasis added by the court.)

In *Dugas,* the rightful heirs of the former owner of real property sued to establish title. The possessor of the property, who had purchased it at a judgment sale from the purported heirs, contended that the plaintiffs had tarried too long in bringing their claim and that title had, in any event, passed to the possessor by means of prescription. The validity of the defense turned on whether the defendant should have known that there were potential claimants to the land. The court found that the possessors of the land had notice of certain facts which should have led them to investigate whether there were potential claimants. Because an investigation would have revealed these claimants, the court imputed to the defendants knowledge of the true circumstances. More recent Louisiana cases agree that knowledge may be imputed to purchasers who would have acquired actual knowledge of defects in their title upon a proper investigation. *See, e. g., Thibodeaux v. Quebodeaux,* La.App.Ct.1973,

282 So.2d 845.[7] In that case, the court applied this concept to Article 3452 of the Civil Code, which defines a possessor in bad faith as one who "well knows that he has not title to the thing".

The district court, stressing the language in the passage quoted by *Dugas* from *Ruling Case Law* that negligent ignorance has the same effect as actual knowledge "where there is a duty of finding out and knowing", reasoned that these cases were merely another manifestation of the negligence theory. And just as there is no "negligence in the air", there is no *general* duty to use care. Rather, the duty of finding out and knowing must be owed to a particular class of plaintiffs or analyzed with reference to the particular risk to which the victim is subjected.

It is not surprising that the court, applying the principle of foreseeability, held that Drilco owed no duty to Equilease, whose existence it never suspected, to inquire into the circumstances. The court acknowledged that Drilco was "less than circumspect" in its behavior, considering the previous relationship between Drilco and Dril-Wate, the unusual payment arrangement and the obviously forged invoices. The court concluded, however, that these factors have no weight in adjudicating the legal claim of Equilease, because "whatever Drilco's obligation to know or inquire existed in this case did not extend to this plaintiff". Memorandum Opinion, pp. 62–63.

There is merit to the plaintiff's contention that the duty to inquire, as set forth in *Dugas,* and the other Louisiana cases in that line, is a general one precisely because it is divorced from negligence theory. It is a different sort of duty in that it arises from notice of questionable circumstances that ordinarily excite inquiry and is not one that is owed to a particular party or class of persons. The court in *Dugas* explained:

---

**7.** Other Louisiana cases employing the concept of negligent ignorance in the notice sense are *McCoy v. Pacific Coast Fire Insurance Company,* 1965, 248 La. 389, 178 So.2d 761; *Bailey v. American Marine,* 1966, 249 La. 98, 185 So.2d 214; *Jones v. Shreveport Lodge # 122,* 1952, 221 La. 968, 60 So.2d 889; *Juneau v. Laborde,* 1951, 219 La. 921, 54 So.2d 325; *Tyson v. Spearman,* 1938, 190 La. 871, 183 So. 201; *Mayer v. Ford,* La.App.1943, 12 So.2d 618.

" . . . notice, in its accepted legal sense, means such information on the part of the person charged with notice as would put a prudent person on inquiry to ascertain the true or actual facts."

21 So.2d at 369. Thus, Equilease reasons, if negligent ignorance is at the core a theory of notice or imputation of knowledge, the suspicious factors pinpointed by the district court were sufficient to obligate Drilco to inquire even though it could not foresee that Equilease would be harmed.

▮ We agree with the plaintiff that in certain situations Louisiana courts have recognized the common law principle, often styling it "negligent ignorance", that knowledge of the results of a proper investigation can be imputed to a person who has actual knowledge of elemental facts, yet fails to inquire into their significance.

B. The central question in this case is, of course, whether the Louisiana courts would apply this concept of imputed knowledge as a basis for imposing solidary liability upon a party presented with sufficient questionable circumstances to spur a prudent businessman to investigate the possibility that he is assisting a fraudulent scheme.

The theory that negligent ignorance can be a substitute for actual knowledge of fraud, in a suit for assisting commission of a wrongful act, was urged before the Louisiana Supreme Court in *Evangeline Iron Works, Ltd. v. Lyons,* 1957, 233 La. 307, 96 So.2d 578. In that case, the plaintiff, Evangeline Iron Works, sued E. J. Smith, the owner of a gambling house, who cashed checks payable to plaintiff's order that were fraudulently obtained from the plaintiff by one of its employees, Lyons. The plaintiff, quoting extensively from *Dugas* and *Ruling Case Law,* insisted that Smith could have

easily ascertained, upon an investigation, that Lyons had no authority to endorse and negotiate the company's checks. Because there were sufficient indicia of suspicious circumstances to arouse a prudent businessman to inquire, Smith's negligent ignorance was the legal equivalent of knowledge. Therefore, liability *in solido* could be imposed upon Smith for assisting the employee in embezzling funds.

The Louisiana Supreme Court disposed of this argument with the comment: "[The] plaintiff, as stated by the trial judge in his written reasons for judgment, has already conceded in the lower court it *failed to establish its case* so as to bring it within the purview of the provisions of Article 2324".[8] 96 So.2d at 580 (emphasis added). To discover whether the Louisiana court rejected the theory of negligent ignorance as a basis of recovery or held merely that the theory did not apply to the facts of the case, we look first to the opinion of the state trial judge.

In its first opinion in *Evangeline Iron Works* the district court upheld the pleadings against a claim of no right of action. The plaintiff had patterned its complaint on pleadings approved by the Louisiana appellate court in *Little v. Campbell,* La.App.Ct. 1945, 20 So.2d 627. There, the plaintiff alleged that a gambling house was liable *in solido* under Article 2324 for accepting the checks of one of the plaintiff's employees with "actual and constructive knowledge" that the checks were wrongfully obtained. The court refused to dismiss the pleadings, noting that there could hardly be a clearer case of one person assisting and encouraging another in the commission of a wrongful act "where such person cashes a draft for another person and the person cashing the draft . . . not only knows that

---

**8.** Continuing, the court said:
Furthermore, taking plaintiff's own brief, wherein it is admitted that in order to prevail on this theory it was required to establish that Smith, in cashing the checks, had knowledge of Lyons' appropriation of the funds and himself profited by the transactions, we find the concession that "the record fails to prove that Lyons lost a substantial part of the proceeds from the checks in gambling .with

Smith." In fact, the record fails to establish that Lyons lost any money gambling with Smith or in a place operated by him, or that Smith, in fact, derived any benefit or profit of any kind from Lyons's manipulations. Moreover, as will be shown hereafter, the checks were cashed by Smith in good faith, for full value, and without knowledge of any defalcation. 96 So.2d at 580.

these funds are being misappropriated but actually profits from the transaction". The court also observed that "the knowledge charged to the defendants is not a conclusion, but is a fact to be proved as any other material fact must be proved in a case". 20 So.2d at 628.

The court in *Little* construed the pleadings as alleging actual knowledge of fraud by the defendant. The pleadings in *Evangeline Iron Works* were also approved only on that basis. The district court entered judgment against Evangeline Iron Works, however, because the plaintiff conceded in its reply brief "that it has failed to make out a case against Smith as to bring it under the decision rendered in the *Little* case".

In *Evangeline Iron Works* the argument that negligent ignorance could substitute for actual knowledge was made for the first time on appeal to the Louisiana Supreme Court. The court responded that the plaintiff had conceded failure to establish liability under Article 2324 in the lower court, where the suit proceeded on the theory of the *Little* case. This response suggests, perhaps, a rejection of the notion that liability for assisting a fraudulent scheme can be imposed on any other basis. But whether the court was referring to the requirement that the defendant have actual knowledge of fraud or that it profit from the transaction, two factors mentioned in *Little,* remains unclear. Indeed, the court pointed to the plaintiff's concession on appeal that Smith did not profit as a major reason for refusing to impose liability under Article 2324. 96 So.2d at 580. Finally, the

court added that Smith acted at all times in good faith, without knowledge of any circumstances that would indicate that Lyons lacked authority to cash the plaintiff's checks. Thus, there is no doubt that, whatever the court's view of the theory of negligent ignorance, it saw no occasion for applying the doctrine in that case.

C. We must proceed, then, on the assumption that Louisiana law is not yet clear as to whether negligent ignorance can substitute for actual knowledge in a suit under Article 2324.[9]

■ The Louisiana cases applying negligent ignorance, in its notice sense, do not provide much guidance because they bear little resemblance to the situation before us. The cases are, without exception, concerned with the duty of purchasers or possessors to investigate defects in title to property or other objects lest they forfeit their defense to a suit for recovery of property or rescission of a contract. Knowledge is imputed in these cases to estop the defendant from taking inequitable advantage of a predicament caused by his own failure to investigate.[10] We are not concerned here with preventing the defendant from obtaining an unfair advantage of his own but with imposing a further obligation on the defendant to compensate the victim of fraud for the loss he sustained. Moreover, the predicament of the plaintiff was not caused by the direct action of the defendant since he was not originally a party to the fraudulent transaction. Rather, the defendant's relationship to the plaintiff arises only from the fact that he may have been able to

---

**9.** We are aware of our obligation under *Erie R. Co. v. Tompkins,* 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, to follow the decisions of the Louisiana appellate courts as well as the Louisiana Supreme Court. But, contrary to Drilco's contention, we are not compelled by *Little v. Campbell,* La.App.1945, 20 So.2d 627, to hold that only actual knowledge suffices under Article 2324. The *Little* court, addressing the procedural context of a challenge to the pleadings, held that there could be no clearer case of fraudulent assistance under Article 2324 than that based on actual knowledge of the defendant. The court, of course, expressed no view on whether a case could be sustained

on the lesser showing of knowledge of suspicious circumstances exciting inquiry.

**10.** Although the principle of equitable estoppel originated in suits challenging the validity of a defendant's legal record or deed, it has been applied at common law in suits based on fraud. Thus, a party who permits a wrongdoer to sell his own goods to another, either by intentionally remaining silent or unreasonably failing to detect and avert the fraud, cannot later enforce his rights by seeking recovery against the defrauded party. Restatement of Torts § 894(2); Prosser *Torts* (4th Ed.) 691–693.

prevent the predicament had he investigated the possibility that he was assisting a fraud.

 Turning to the common law, from which the doctrine of negligent ignorance appears to have been borrowed, we find that it does not offer much protection to remote victims of fraud in this situation. A third person who has knowledge of circumstances putting him on notice of fraud is rarely found liable for damages for failing to disclose the fact of fraud or protect another party unless he has some control over the wrongdoer or stands in a special relationship to the victim. *See generally,* Keeton, *Concealment and Nondisclosure,* 15 Tex.L.Rev. 1 (1936); W. Prosser, *Torts* (4th Ed.) 695–699. The reluctance to impose liability reflects the common law's lenient view toward sins of omission. If a defendant's relation to the damage stems primarily from the fact that he could have prevented it or rescued the victim by doing something rather than nothing, he is not held to a duty to take reasonable care, absent special circumstances. *See* Restatement (Second) of Torts, § 314 (1965); Prosser, *Torts* (4th Ed.) 338–350. Indeed, at common law, those who attempt to avoid damage to another act at their own peril. The civil law has been less reluctant to impose liability for faults of omission, however. Instead, the decision is left to the judge, as a question of law, to determine what is fair and reasonable in the circumstances. *See generally,* Catala & Weir, *Delicts and Torts: A Study in Parallel,* 37 Tul.L.Rev. 573, 614–620 (1963).

 The proper framework, then, for deciding whether liability for fraud should be imposed, by application of the device of negligent ignorance, on a third party who failed to investigate is a consideration of the need to protect persons from being cheated as against the strain on the marketplace that can result from requiring constant investigation into the possibility that one's daily business transactions will impinge on the interests of a party with whom one has no relationship. The Louisiana courts have had no opportunity to consider this hard problem. We are also reluctant to express judgment on it now at the risk of doing violence to the law of Louisiana or retarding its development, especially where there is an alternative ground on which to base our decision. As in *Evangeline Iron Works,* the principle of negligent ignorance is ill-suited to the facts of this case. For negligent ignorance to apply, there must be both sufficient suspicious circumstances to compel a prudent person to inquire into possible fraud as well as the means of actually discovering the fraudulent conspiracy. Thus, even if we were to accept the district court's observation concerning Drilco's "less than circumspect behavior" as a finding of suspicious circumstances, we can see no path around the fact that Drilco could not have unraveled the fraudulent scheme by conducting an investigation.

 The district court expressly found that White inquired into the size of the excess payments and the forged invoices. He sought assurances from First Leasing, the purchasor-lessor, and from Dril-Wate, the lessee. The co-conspirators obviously had considerable interest in preventing Drilco from discovering the identity of Equilease or the true nature of the transaction. And as the district court found, they managed to allay White's concern. Equilease kept secret its participation in the transaction. And it was essential to Growden, Perdue, and Ryland to keep Drilco from learning of the involvement of Equilease to prevent Drilco from making inquiries that would uncover the scheme. Because Drilco could not know that First Leasing was acting for a backer and could not have known or discovered the existence of Equilease, it did not have the means to ascertain that the lease transaction was fraudulent. Certainly, we cannot impute knowledge of facts that would not have been uncovered after a scrupulous investigation.

## IV

We turn now to the plaintiff's contention that Drilco became a party to the fraudulent conspiracy, even though it was igno-

rant of what was actually intended, by virtue of its reckless indifference or carelessness. The district court strongly doubted that the defendant could be bound under Article 2324 as a joint tortfeasor with respect to the intentional tort of fraud if Drilco's assistance was unintentional.

At bottom, the theory of recovery urged here is negligence rather than deceit. An early Louisiana case, *Howcott v. Talen,* 1913, 133 La. 845, 63 So. 376, recognizes this distinction. The court mentioned, in passing, that a person who unwittingly assists a fraudulent scheme "merely upon the faith" of a wrongdoer's representations may be guilty of gross negligence; hence, he may be liable for the damage that results even though he is a victim rather than a confederate of the originators of the scheme.[11]

 Logically, a party may be held individually liable for negligence whether the damage caused to the plaintiff takes the form of fraud or bodily injury. And we perceive no impediment to binding a defendant who acts negligently *in solido* with those who commit an intentional tort when the same harm to the plaintiff results, provided, of course, that each party is legally at fault.[12]

 Drilco was not negligent here, however. In the first place, the district court found, and we agree, that Drilco could not reasonably foresee that its conduct would create a risk of injury to the plaintiff. Whether Drilco acted carelessly or failed to exercise the standard of diligence of a prudent businessman is immaterial because it owed no duty to Equilease to take care. *See Robert Heard Hale, Inc. v. Gaiennie,* La.App.1958, 102 So.2d 324; Lawson, *The Duty of Care in Negligence: A Comparative Survey,* 22 Tul.L.Rev. 111 (1947). Second, in the circumstances, Drilco did all that could reasonably be expected of it. Drilco could not notify Equilease because it did not know of the plaintiff's existence. It could not notify the authorities because it had no concrete evidence of unlawful behavior. Nor was there any reason for Drilco to reverse the money wire sent by First Leasing when First Leasing, whom Drilco could reasonably assume was dealing with its own funds, assured it that nothing was amiss.

## V

The plaintiff's quasi-contractual claim for relief rests on the Louisiana doctrine of unjust enrichment. Equilease seeks to recover $90,386.30, reflecting the sum that Drilco obtained from First Leasing and applied in satisfaction of the debt owed to it by Dril-Wate.

Article 2301 of the Louisiana Civil Code expresses this theory of recovery:

> "The *gross* fault is that which proceeds from inexcusable negligence or ignorance; *it is considered as nearly equal to fraud.*

**11.** The defendant has urged us not to rely on *Talen* for the proposition that gross negligence is a basis of recovery by a defrauded party. True, there is some confusion concerning the authority of these remarks. The direct statement that a person who is inveigled into participating in a fraudulent conspiracy, through gross negligence or indifference to the consequences, may be held liable is contained in a headnote to the case. That headnote appears to have been written by the court, however. Moreover, the text of the case supports this statement—although by inference. See 63 So. at 379.

In any event, the Civil Code amply supports the dictum in *Talen.* Article 3556, the final provision in the Code, states in § 13 that there are three degrees of fault: the gross, the slight, and the very slight. The degree of fault described as gross fault is applicable to this case:

**12.** In Louisiana, the basis of all delictual recovery is fault. The notion of fault encompasses, besides the doing of an unlawful act, both the intentional harming of another (*dolus*) and the negligent harming of another (*culpa*). See Stone, *Tort Doctrine in Louisiana: The Concept of Fault,* 27 Tul.L.Rev. 1, 8–13 (1952).

True, imposing solidary liability on co-delinquents, when one has committed a willful harm and the other a negligent one, may lead to inequitable results if there is no apportionment of fault between the defendants. The one who is negligent is rarely equally at fault with the one who intends to harm. But the same inequity results when one tortfeasor is grossly negligent and the other is only slightly negligent. The remedy lies in regulating contribution rather than limiting the ambit of Article 2324.

"He who receives what is not due to him, whether he receives it through error or knowingly, obliges himself to restore it to him from whom he has unduly received it."

The codal article obligates the receiver to restore what he has received "to him from whom he has unduly received it". The text would appear to permit recovery on this theory only when the payments to a defendant of a sum not owing is made by the *plaintiff,* and not by a third party. Indeed, the classical Roman action in *repetition* (recovery) of the thing not due (*condictio indebiti* ), from which the Louisiana article is derived, is limited to the situation of payment by a plaintiff to a defendant. *See* Nicholas, *Unjustified Enrichment in Civil Law and Louisiana Law,* 36 Tul.L.Rev. 605, 613 (1962); 37 Tul.L.Rev. 51 (1962). Nonetheless, in Louisiana jurisprudence Article 2301 is often applied in cases of third party payments. *See Cox v. W. M. Heroman & Co., Inc.,* La.Sup.Ct.1974, 298 So.2d 848, 853, n. 7; *Roney v. Peyton,* La.App.1935, 159 So. 469. There is ample justification for this departure by the Louisiana courts from the language of Article 2301. Other Louisiana codal articles provide authority for a remedy of unjust enrichment of broad application. Thus, Article 1965 of the Louisiana Civil Code refers to "the moral maxim of the law that no one ought to enrich himself at the expense of another". And Article 21 of the Civil Code provides that "in all civil matters, where there is no express law, the judge is bound . . . to decide according to equity".

■ Exercising its equitable muscle, the district court determined that Drilco did not receive "what is not due him". We find support for the court's decision in Louisiana jurisprudence. Where, as here, a creditor receives payment in satisfaction of a valid debt from a person who is in reality not his debtor, the Louisiana courts first ask whether the creditor accepted the payment in good faith, without knowledge that the debtor had no authority to transfer the funds. If so, and the equities are balanced in favor of the payee, most often because the party who actually made payment was negligent, the creditor is not obligated to return the payment. *Evangeline Iron Works, Ltd. v. Lyons,* 1957, 233 La. 307, 96 So.2d 578; *cf. Insurance Company of North America v. Davidson,* La.App.1973, 282 So.2d 585.[13]

True, the text of the Code does not mention negligence as a restriction on recovery. But this notion of comparative fault is embedded in the jurisprudence surrounding the quasi-contractual provisions. *See Whitehall Oil Co. v. Boagni,* 1969, 255 La. 67, 229 So.2d 702; *Metropolitan Life Ins. Co. v. Mundy,* La.App.1936, 167 So. 894. *See generally,* Palmer, *Contractual Negligence in the Civil Law—The Evolution of a Defense to Actions for Error,* 50 Tul.L.Rev. 1, 39–40 (1975). Thus, the *Evangeline* court, denying recovery under Article 2301 on facts similar to those in the instant case, explained that "as between two innocent persons, one of whom must suffer the consequences of a breach of trust, . . . the [party] who made it possible by his act of confidence [in the wrongdoer] must bear the loss".

**13.** The case of *Roney v. Peyton,* La.App.1935, 159 So. 469, is, on its facts, in line with this approach. There, the defendant-creditor accepted a note of the plaintiff corporation given to the creditor by the president of the corporation in satisfaction of his personal debt. The court allowed recovery, stressing first, that the defendant knew the facts when it accepted payment and second, that the one who accepts the assets of a corporation in payment of personal obligations of its officers always does so at his peril and is put upon inquiry. 159 So. at 474. *See also Continental Casualty v. Ramon,* La. App.1963, 151 So.2d 526, where the court allowed the plaintiff to recover against the purchaser of stolen property because the purchaser was well-acquainted with the thief and in the circumstances of that case "should have become suspicious, made inquiry and quickly discovered Ramon's thievery."

The plaintiff has cited to us only one Louisiana case that allowed recovery against a purchaser of stolen property even though the purchaser bought in good faith. *Martin v. Texas Co.,* 1921, 150 La. 556, 90 So. 922. That case was decided, however, on a delictual and not a quasi-contractual theory of recovery. The court adopted the common law approach of treating the bona fide purchaser as committing the tort of conversion.

The result that the Louisiana courts reach accords with the civilian principle of cause or absence of justification, although these terms have not been expressly invoked in any Louisiana decision. Thus, under French law, if a valid debt exists between a third party and the defendant who received the payment in good faith, no action *de in rem verso* is available to the plaintiff who was impoverished because there was a "cause legitimé" justifying the defendant's enrichment. Nicholas, *Unjustified Enrichment in the Civil Law and Louisiana Law,* 36 Tul.L.Rev. 604, 626–633 (1962).

We agree with the district court that Equilease and not Drilco must bear the loss. Equilease should have investigated the lease package presented by its broker, First Leasing. That package included undated invoices, the forged signature of a Drilco official whom Equilease had dealt with in the past, and the amateurish draft of a fictitious corporate resolution purportedly signed by a corporate official of Smith International, whose name differed from the listing in Moody's Industrial Manual.

Accordingly, the judgment of the district court is AFFIRMED.