496 So.2d 1105 (1986)
McDERMOTT, INC. (HARVEY SUPPLY DIVISION)
v.
M-ELECTRIC & CONSTRUCTION CO., INC.
M-ELECTRIC & CONSTRUCTION CO., INC.
v.
McDERMOTT, INC. (HARVEY SUPPLY DIVISION), G & W Electric Specialty Co., and General Electric Company.
Nos. CA-4940, CA-4941.
Court of Appeal of Louisiana, Fourth Circuit.
October 9, 1986.
*1107 Clement P. Donelon, Mary M. Ferry, Donelon & Donelon, Metairie, for defendants-appellees, G & W Elec. Co. and Jeanes Enterprises.
Lawrence J. Ernst, Joseph R. Ballard, Christovich & Kearney, New Orleans, for defendant-appellee, General Elec. Co.
Douglas A. Kewley, Bruce A. North, Molony, North & Hanewinckel, Metairie, for appellant, M-Electric & Const. Co., Inc.
Before GARRISON, KLEES, and CIACCIO, JJ.
CIACCIO, Judge.
M-Electric & Construction Co., Inc. appeals from a judgment of the district court which sustained the peremptory exception of prescription filed by G & W Electric Specialty Company, General Electric Company and Jeanes. We affirm.
There are two issues on appeal: (1) From which date did prescription begin to run? and (2) Which prescriptive period(s) apply?
On January 9, 1980, M-Electric and Construction Company (hereafter referred to as M-Electric) was awarded a contract to build an electrical distribution system for the United States Navy at Callender Field Air Station. As part of the contract M-Electric made stress cone terminations on high voltage switches. The high voltage switches were contained in boxes buried below ground. The bottom of each switch box contained 6 to 12 terminations wherein the high voltage cables were connected to the stud bushings. The terminations were made from materials contained in termination kits. Pursuant to the Navy's instructions the termination kits with the switches were purchased by M-Electric from G & W Electric Specialty Company (hereafter referred to as G & W) through Harvey Supply Co. G & W requested that it be supplied ATK5-G3 termination kits. The initial ATK5-G3 termination kits contained a varnished cambric tape.
M-Electric personnel made the initial terminations. In order to install these new switches and terminate the cable into them a power outage schedule was created by the Navy. During the outages the hot switches were terminated. The cold switches were those new switches being terminated to new cable and did not require power outages.
The first power outage was scheduled to start on January 19, 1981 and involved the termination of Switch Number One. On January 21, 1981 when Switch Number One was re-energized, it failed.
Following this failure, M-Electric questioned the qualifications of their personnel to make terminations. It thereafter hired General Electric Company (hereafter called G.E.) technicians to terminate the high voltage switches. M-Electric removed all of the terminations which its personnel had made. On January 27, 1981 M-Electric ordered additional ATK5-G3 termination kits from G & W through Harvey Supply, a division of McDermott, Inc. The ATK5-G3 kits supplied pursuant to this order contained nozone insulating tape. These kits arrived on February 7, 1981.
On January 21, 1981 G.E. began to build the terminations using the termination kits *1108 with the varnished cambric tape. Beginning on February 9, 1981 until the end of their term of work, G.E. used both types of termination kits. On February 3, 1981 the second failure occurred on a G.E. built termination in Switch Number Six. On February 13, 1981 there was a third failure in Switch Number Seven. On February 19, 1981 the Navy personnel and M-Electric personnel met and it was decided that work on the job would be halted until the oil utilized in the switches could be verified and all switches tested. The Navy also questioned the qualifications of the splicers on the job. M-Electric was also notified of this decision in writing on February 23, 1981. The Navy would allow no more outages to occur after March 10, 1981 and so advised M-Electric by letter of March 16, 1981.
By March 10, 1981 M-Electric felt that there was a problem with the tape utilized in the termination kits. It was at this time that all work on the job ceased. On April 7, 1981, the Navy advised M-Electric of another failure in the system at the new Switch Number One and of a punch list of ongoing problems with the high voltage system. Continual efforts to satisfy the Navy as to the qualifications of the G.E. technicians were unsuccessful. At this time the job was 80% complete. On July 18, 1981 the Navy required all terminations be removed and replaced. On July 27, 1981 M-Electric agreed to meet A.S.T.M. specifications on the insulating oil, open all switches, inspect contacts for proper alignment and if necessary remove, test and replace all oil in the switches.
The job resumed in May, 1982. It was completed on June 9, 1982 with the use of Hi Voltage Testing's personnel and termination kits which utilized 3 M Tape. The Navy accepted the job under the contract on January 28, 1983 although each item in the system had to be approved as it was placed into service.
On February 18, 1983, McDermott filed suit against M-Electric claiming monies due for materials supplied. (Doc. No. 25-119) On April 6, 1983, defendant, M-Electric answered the suit with a general denial and filed a third party action against G.E. for "poor workmanship" and against G & W through Harvey Supply, alleging "improperly supplied" materials and "defective" materials.
On July 19, 1983 M-Electric filed suit against McDermott, Inc. and G & W alleging "improperly supplied" materials and the supplying of "defective" materials by these defendants. It also sued G.E. for "poor workmanship". (Doc. No. 25-573). These two suits were consolidated for trial.
On February 28, 1985 McDermott and M-Electric compromised their claims against each other and dismissed their actions against each other with prejudice, while reserving their respective claims against all remaining parties. On March 18, 1985 G.E. dismissed its action against Harvey Supply, without prejudice. All the remaining parties proceeded to trial on February 25-26, 1985 and May 21-22, 1985.
On May 31, 1985 the trial court rendered judgment in favor of the defendants and against plaintiff maintaining the pleas of prescription and dismissing plaintiff's suit. Plaintiff appeals this judgment contending that the trial court erred in finding that prescription began to run from March 10, 1981 and in applying a one year, rather than a ten year, prescriptive period.
Applicable Date
The trial court found that M-Electric was fully aware of the damages to the system by March 10, 1981. The court reasoned as follows:
The Court cannot agree with plaintiff that its cause of action arose on June 17, 1982. All of the evidence introduced and all of the testimony of plaintiff's witnesses prove [cleary] and [unequovically] that all plaintiff's employees, supervisors and or superintendants were aware that serious questions of workmanship and quality material existed well before June 17, 1982.
The record is abundantly clear that both of plaintiff's witnesses, Mr. Ainsworth and Mr. Bowers who were in *1109 charge of the operation for M-Electric were aware as of March 10, 1981 that either the materials furnished by G & W and the technical work performed by G.E. splicers had caused the failure of the terminations.
Both Mr. Ainsworth and Mr. Bowers testified that G.E. splicers were called on to perform work on January 21, 1981 which was the first time that G.E. splicers were on the job and further testified that G.E. splicers continued to perform scheduled work until March 10, 1981.
By March 10, 1981 M-Electric was fully aware that either G.E. had performed in an unworkmanlike manner or the material used by G.E. and furnished by G & W was defective or inadequate to perform the work [satisfactorily].
It was at this time that the Navy informed M-Electric that all of the work on the terminations had to be removed and replaced because of the [defected] material or improper workmanship.
M-Electric's cause of action arose at the time it became aware that it had been damaged in tort by the wrongful acts or negligence of G.E. and/or the furnishing of defective material by G & W.
The court is of the opinion that prescription commences to run from the date that damages are sustained and therefore M-Electric was derelict in failing to file suit for the tortious acts at the time it became aware of the damages.
Prescription for delictual actions begins to run from the day injury or damage is sustained. C.C.Art. 3492.
In Cartwright v. Chrysler Corp., 255 La. 597, 232 So.2d 285 at 287 (1970), the Louisiana Supreme Court discussed the type of notice which would begin the running of time for purposes of prescription:
Also, it is not necessary that the party have actual knowledge of the conditions as long as there is "constructive notice." Whatever is notice enough to excite attention and put the owner on his guard and call for inquiry is tantamount to knowledge or notice of every thing to which inquiry may lead and such information or knowledge as ought to reasonably put the owner on inquiry is sufficient to start the running of prescription.
In this case the appellant argues that, until June 17, 1982, when the terminations were dissected and a report received of the laboratory findings, the cause of action had not been manifested to such a degree as to start the running of time for prescription. We disagree.
The trial court found that "By March 10, 1981 M-Electric was fully aware that either G.E. had performed in an unworkmanlike manner or the materials used by G.E. and furnished by G & W were defective or inadequate to perform the work satisfactorily." This finding by the trial court is entitled to great weight and will not be disturbed unless clearly wrong. Canter v. Koehring Co., 283 So.2d 716 (La.1973); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978), writ denied, 374 So.2d 660 (La.1979).
The record clearly supports this factual finding by the trial court.
Ted Ainsworth was the general manager for M-Electric Company during the time of the Navy project until the end of May, 1981.
The first power failure on the project occurred in Switch No. 1 on January 21, 1981. M-Electric was notified of this incident by a mailgram sent from the Navy on January 21, 1981. It was at this time that Ainsworth felt there existed "real trouble." He stated that it was his opinion that M-Electric's personnel were not qualified to perform this type of work. On that date, Ainsworth contacted G.E.'s Apparatus Service and requested that they send splicers to perform the high voltage terminations. Ainsworth testified that this course was taken because M-Electric was afraid that the Navy was going to place them in default. On February 3, 1981 the Navy notified M-Electric by mailgram of a second failure. This failure occurred in a termination completed by G.E.'s personnel. Ainsworth testified that it was at this time that M-Electric began to suspect that there *1110 existed a problem with the type of tape utilized in the termination kit supplied by G & W. This conclusion was reached because the two installations which failed had been performed by different personnel. Ainsworth so advised the Navy by a letter written in March 1981. On March 10, 1981, G.E. was dismissed from the job and not allowed to continue regular work on the job because M-Electric was unsuccessful in getting the G.E. personnel's qualifications approved by the Navy.
Therefore, in this case, by March 10, 1981 when G.E. left the job, M-Electric had knowledge that the failures were caused by defective materials and/or faulty workmanship. They had such knowledge as would place them on guard and call for inquiry. This knowledge was sufficient to start the running of prescription.
Accordingly we find no error in the trial court's finding that prescription began to run on March 10, 1981.
Prescriptive Period
The trial court found that the tort claim prescribed in one year and the contractual claim, which was founded upon a breach of warranty, also prescribed in one year.
M-Electric contends that a ten year prescriptive period applies.
M-Electric first argues that G & W supplied improper termination kits not defective kits and therefore the claim is one in contract not redhibition.
In Lafleur v. Brown, the Louisiana Supreme Court discussed the selection of applicable prescriptive periods, 223 La. 976, 67 So.2d 556 at 557 (1953). The Court stated:
"The rule is well settled that a party to a contract may have a money demand against the other party to a contract and may sue either on the tort or upon the contract at his option or election. Liles v. Barnhart, 152 La. 419, 93 So. 490, and authorities there cited. The character of the action determines the prescription applicable thereto. If the action is purely one in tort, then it is prescribed by one year. If the action is predicated on a breach of the contract, then it is only prescribed by ten years."
Damages caused by a breach of warranty in a contract of sale are regarded as founded upon redhibition (i.e. avoidance of a sale due to a defect in the thing sold, C.C.Art. 2520) and as such are subject to a one year prescriptive period. Victory Oil v. Perret, 183 So.2d 360 (La.App. 4th Cir., 1966), writ refused, 249 La. 65, 184 So.2d 435 (1966); Tripod Boats, Inc. v. George Engine Co., 170 So.2d 238 (La.App. 4th Cir.1964); Yeargain v. Blum, 144 So.2d 756 (La.App. 4th Cir.1962).
When a product is contracted for and a product other than what was agreed upon is supplied, such a situation gives rise to an action for breach of contract. Victory Oil v. Perret, supra. It does not matter that the delivery of the wrong commodity may have been caused by negligence, giving rise to an action in tort, Victory Pil v. Perret, supra. In such cases, a ten year prescriptive period is applicable. C.C.Art. 3499.
In this case M-Electric filed suit against G & W through Harvey Supply Company. In their petition, M-Electric alleged that G & W through Harvey Supply had supplied "defective equipment" and that the equipment which was supplied was "improperly supplied."
Insofar as M-Electric alleged that they received defective equipment, this claim states a cause of action in tort grounded upon redhibition. C.C.Art. 2520. Such claims prescribed in one year from the date of sale, from the buyer's discovery of the defect if the vendor knew or is chargeable with knowledge of the defect or from the date the seller last attempted to repair the defect. C.C.Art. 2534, 2546. Peoples Water Service v. Menge Pump & Machinery, 452 So.2d 752 (La.App. 5th Cir.1984), writ denied, 456 So.2d 1391 (La.1984). In this case the sale of the termination kits occurred on October 12, 1979 and January 27, 1981 respectively. There is no evidence the vender knew or was chargeable with knowledge of the defect *1111 nor that attempt to repair were made. Suit was not instituted against G & W until April 6, 1983 and July 19, 1983 which was more than a year after the respective sales. Accordingly, this claim in redhibition has prescribed.
Additionally, the evidence presented does not give rise to a claim for breach of contract as it does not support M-Electric's claim that the wrong product was supplied.
No proof was presented that the termination kits (i.e., kits containing varnished cambric tape and kits containing nozone tape) supplied by G & W through its distributor Jeanes to Harvey Supply for sale to M-Electric did not meet the government contract specifications. The Navy had specified that the materials were to be secured from G & W and a copy of the Navy's specifications were provided to Harvey Supply Co. The electrical salesman for Harvey Supply Company who quoted the job, Sonny Fortier, testified that the kits that were supplied met the specifications set forth in the original plans and specifications of the contractor prior to bid and were approved by the Navy prior to their installation.
The Navy specifications did not designate the particular components to be utilized in the termination kits. It merely required that the termination had to meet the requirements of IEEE Standard No. 48. Timothy Pudlo, an expert who examined both kits concluded that the tape in the old termination kits did not meet the specifications of any of the tapes listed in the specifications. However, he was unable to say whether the requirements of IEEE Standard No. 48 were met.
Since the trial court concluded that the only contractual claim stated by M-Electric was one for breach of warranty, the court apparently found that M-Electric failed to prove that the termination kits provided by G & W were improperly supplied. Considering the evidence presented, we cannot say that this finding is clearly wrong. Arceneaux v. Domingue, supra. Therefore the seller did what it contracted to do, that is, to supply termination kits that met the Navy's specifications. Accordingly, absent proof to the contrary, M-Electric has only presented a contractual claim for breach of warranty. Such a claim is founded upon an action in redhibition, and it prescribes in one year. C.C.Art. 2534. See: Crowley Grain Drier, Inc. v. Fontenot, 132 So.2d 573 (La.App. 3rd Cir.1961).
Since M-Electric did not file suit on this claim within the year, the claim prescribed and the trial court correctly reached this conclusion.
M-Electric also contends that its claim against G.E. for improper workmanship has not prescribed because this claim is subject to a ten year prescriptive period.
M-Electric reasons that it entered into a building contract with G.E. and G.E.'s improper workmanship on the contract gave rise to an action in contract and not tort.
Generally, delictual conduct gives rise to a cause of action in tort which prescribes in one year. C.C.Art. 3492. Sharpe v. Claiborne Enterprises, Inc., 461 So.2d 591, (La.App. 1st Cir.1984), writ denied, 464 So.2d 302 (La.1985) However, actions for damages caused by the breach or negligent execution of a construction or installation contract, in which the principal obligation is to do or not to do, prescribes in ten years. Sharpe v. Claiborne Enterprises, Inc., supra; Yeargain v. Blum, supra. The character of the action determines the applicable prescriptive period. Sharpe v. Claiborne Enterprises, Inc.; Lafleur v. Brown, supra.
In this case G.E. agreed to and did rebuild the stress cone terminations. Such activities are in the nature of a construction or installation contract. Therefore, normally, the negligent execution of this type of contract would give rise to an action for damages which prescribes in ten years. However, in this case, the trial court found that M-Electric and G.E. had contracted for a one year prescriptive period for this claim.
The Louisiana Supreme Court has recognized the right of parties to agree to a *1112 shorter prescriptive period than that provided by statute provided certain conditions are met. Leiter Minerals, Inc. v. California Co., 241 La. 915, 132 So.2d 845 (1961). In Leiter Minerals, supra at 853, the Louisiana Supreme Court set forth the requirements:
Parties to a contract are free to stipulate as they please so long as their stipulations are not contrary to good morals or public policy or do not violate some law. La.Civ.Code Arts. 1764, 1895, 1901; American Cotton Co-op. Ass'n v. New Orleans & Vicksburg Packet Co., 180 La. 836, 157 So. 733; Mente & Co. v. Roane Sugars, Inc., 199 La. 686, 6 So.2d 731; Givens v. Washington Nat. Ins. Co., La.App., 170 So. 810; Morris Buick Co. v. Ray, La.App., 43 So.2d 83. It has also been recognized in this state, and by the courts of other states and the Supreme Court of the United States, that those entering into a contract may stipulate a different period of prescription or limitation from that provided by a state statute, and that the limitation or prescriptive period as thus stipulated, if reasonable, will be binding upon the parties. Blanks v. Hibernia Ins. Co., 36 La.Ann. 599; Ray v. Liberty Industrial Life Ins. Co., La.App., 180 So. 855; see Order of United Commercial Travelers of America v. Wolfe, 331 U.S. 586, 67 S.Ct. 1355, 91 L.Ed. 1687 (in the absence of a controlling statute to the contrary); Hoagland v. Railway Express Agency, Fla., 75 So.2d 822. See also Wood, Limitation of Actions, v. I, p. 145, sec. 42 (4th ed. 1916).
In this case G.E. provided M-Electric with a copy of its standard contract. M-Electric's supervisor, Ted Ainsworth, admitted receipt of the contract and stated that he was aware of G.E.'s warranty form, containing the limitation language which appeared on the reverse of the cover sheet. The applicable language reads as follows:
Warranty
a. Warranty Period. This warranty shall apply only to defects appearing within one year from the date of completion of the service by the Company. As to services performed on instrumentation, communication, x-ray or control devices, the warranty period is 90 days from completion of the service, unless otherwise specified.
* * * * * *
e. Warranty Stated Above is Exclusive. The preceding paragraphs set forth the exclusive remedies for claims (except as to title) based on failure of or defect in equipment, material, components or services, whether claim is made in contract or tort (including negligence) and however instituted, and, upon the expiration of the warranty period, all such liability shall terminate....
M-Electric first contends that the one year warranty period was distinctive from and did not affect the ten year prescriptive period. It relies upon Michel v. Efferson, 223 La. 136, 65 So.2d 115 (1952) and Yeargain v. Blum, supra for this position.
In Yeargain v. Blum, supra at 758, this Court cited Michel v. Efferson, supra, as follows:
As to the first, the cited provision in the painting contract guaranteed the material and workmanship for one year from the date of completion of the contract; but it did not provide that suits for breach of this contractual warranty must be brought within one year. This guaranty clause therefore does not affect the prescriptive period within which suit must be brought. Michel v. Efferson, 223 La. 136, 65 So.2d 115. (Emphasis Supplied)
In this case unlike in Michel, supra, the language of the contract clearly indicates that an action for breach of contractual warranty must be brought within one year. (See: contract § 1e). As such the parties have legally effected a one year prescriptive period. Such an agreement is not contra bonos mores nor does it violate any law. Since the stipulated period is reasonable it is binding upon the contracting parties. For these reasons appellant's argument lacks merit.
*1113 Appellant further contends that it did not sign the written acknowledgment form and was not subject to the written contract for G.E.'s services. M-Electric argues that it was only bound by an oral contract with G.E.
Consent to an agreement may be oral, written, by action or even inaction when such inaction is under such circumstances as would clearly indicate consent. C.C.Art. 1927. Illinois Central Railroad Co. v. International Harvester, 368 So.2d 1009 (La., 1979). The trial judge is given discretion to determine if consent may be implied from the particular circumstances of the case. Illinois Central Railroad Co. v. International Harvester, supra.
In this case the trial judge apparently found that M-Electric had consented (albeit, impliedly) to the conditions of the written contract of G.E. The records supports this finding. The contract was not repudiated by M-Electric prior to this case. M-Electric sought benefits of the warranty provision in that Ted Ainsworth testified that if the work was done improperly they would call upon G.E. to replace their splicers at G.E.'s cost. Moreover, John Bowers, operations manager of M-Electric, testified that G.E. was called upon to perform repair work on the job.
Additionally the price, terms and conditions of the agreement were only contained in the written contract of G.E. This is further illustrated by the fact that Ted Ainsworth who was allegedly responsible for confecting the oral contract discussed no terms or conditions for the job with G.E. He testified that he merely telephoned G.E. and requested that they send two qualified splicers, which they did. Under these circumstances we cannot say that the trial judge was clearly wrong in finding that M-Electric impliedly consented to the written G.E. contract.
M-Electric also argues that the warranty provisions of the contract do not apply because the work performed did not qualify under the terms of the contract. That is, the contract refers to "repair, inspection, maintenance, modifications, test or rental service" and M-Electric contends that the work performed was new installation.
An examination of the G.E. contract indicates that G.E. was called upon to "remanufacture stress cones." This notation appears in handwritten form on the G.E. contract. Ted Ainsworth testified that the stress cone terminations performed by M-Electric were removed and G.E. was called upon to rebuild the terminations. Accordingly, the work performed is covered by the language in the contract, under provision 1(G), which indicates that the warranty covers "Repair, Rebuild, Modification." The trial judge correctly found that the G.E. warranty provisions applied to the work performed and thereby bound the contracting parties.
Since the warranty provisions were valid and binding upon the contracting parties and since the contracting parties thereby shortened the prescriptive period for all claims to one year, M-Electric had one year following the completion of the work by G.E. to bring suit in contract against G.E. It failed to do so within that period. Accordingly, the trial court correctly found that this claim by M-Electric against G.E. had prescribed.
For the reasons assigned the judgment of the trial court is affirmed at appellant's costs.
AFFIRMED.