The BANK OF NEW ORLEANS AND TRUST COMPANY, First National Bank of Commerce, (Substituted proper party 9–21–83), Plaintiff-Appellant,

v.

MONCO AGENCY, INC., et al., Defendants, Arthur Young & Company, Defendant-Appellee.

No. 86–3588.

United States Court of Appeals, Fifth Circuit.

Aug. 11, 1987.

Curtis R. Boisfontaine, Sally A. Shushan, New Orleans, La., for plaintiff-appellant.

Eugene R. Erbstoesser, Associate General Counsel, Arthur Young & Co., New York City, Frank J. Peragine, Christopher M. Guidroz, New Orleans, La., for Arthur Young & Co.

Before CLARK, Chief Judge, BROWN, and JOHNSON, Circuit Judges.

CLARK, Chief Judge:

The Bank of New Orleans and Trust Company (BNO) appeals from the district court's summary judgment dismissing its negligence claim against Arthur Young & Company (Arthur Young) on the ground that the claim was prescribed under Louisiana's one-year statute of limitations governing negligence actions. Finding that BNO has properly alleged that Arthur Young is liable to BNO *in solido* with other defendants who were timely sued, we hold that litigation against those defendants interrupted prescription under Louisiana law. We reverse the district court's judgment and remand for further proceedings on BNO's claim against Arthur Young.

I.

Arthur Young conducted an independent audit of Monco Agency, Inc. (Monco) and its subsidiary Cotton Belt Insurance Company (CBIC) for the fiscal year ending December 31, 1980. Monco was a holding company, and CBIC was in the bail bond and surety business. Arthur Young's 1980 financial statements showed that Monco and CBIC were solvent companies. BNO asserted before the district court that it relied on this audit report as well as in-house reports representing the corporations' subsequent financial condition in extending a loan in November 1981 to Monco for over $1.6 million. BNO extended an additional loan of $500,000 to Monco in January 1982. To secure payment of these loans, Monco pledged shares of CBIC stock.

The Monco loan went into default in March 1982. By July 1982, CBIC had been adjudicated insolvent in Texas, placed in

receivership in Tennessee, and faced similar measures in California as well as in other states. BNO officers met with CBIC's appointed receiver in Tennessee (CBIC's state of incorporation) who informed them that CBIC had bail bond losses estimated at $13 million. The BNO officers were also told that many of the outstanding bail bond claims were "old," dating back to February 1979.

BNO filed suit against Monco and its president and principal shareholder Oliver Montagnet on July 1, 1982, approximately three and one-half months after it first learned of CBIC's difficulties and had reason to be concerned over the Monco loan. BNO alleged violations of federal securities laws [1] and the Louisiana Blue Sky Law [2] on the ground that it had extended loans in excess of $2.1 million to Monco in reliance on Monco's and Montagnet's misstatements and omissions of material fact concerning the operations of Monco's wholly owned subsidiary CBIC.

In August 1983, BNO and Arthur Young negotiated an agreement whereby any subsequent action brought by BNO against Arthur Young in connection with the 1980 audit report would be deemed filed as of August 10, 1983. BNO filed a third amended complaint in May 1984 naming Arthur Young as an additional defendant and seeking to hold Arthur Young liable *in solido* for its losses as a result of the Monco loan. BNO alleged that Arthur Young was negligent in failing to conduct the 1980 audit in accordance with generally accepted auditing standards, which would have revealed that CBIC was in financial difficulty arising out of its bail bond activities in several states. BNO alleged that CBIC was in fact insolvent as of December 31, 1980, contrary to Arthur Young's 1980 audit report. BNO further alleged that it relied on Arthur Young's financial state-

---

1. BNO alleged violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, including Rule 10b–5, 17 C.F.R. § 240.10b–5, as well as § 12(2) and § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a). The district court dismissed the securities fraud claim based on § 17(a) of the 1933 Act at the outset.

2. BNO alleged violations under the former La. Rev.Stat.Ann. § 51.715, which was amended in 1985. *See* La.Rev.Stat.Ann. § 51.714 (West Supp.1987). The Louisiana Blue Sky Law is now simply entitled "Louisiana Securities Law." *See* La.Rev.Stat.Ann. §§ 51.701–24 (West Supp. 1987).

ments as well as Monco's in-house reports in extending over $2.1 million in loans to Monco.

Arthur Young moved for summary judgment, arguing that BNO's professional malpractice claim was prescribed under Louisiana's one-year statute of limitations for such a claim. *See* La.Civ.Code Ann. art. 3492 (West Supp.1987).[3] Arthur Young asserted that BNO knew or should have known of a potential negligence claim against Arthur Young on the basis of misleading or false information in the 1980 audit report over a year before the stipulated filing date of BNO's action against Arthur Young. BNO responded that it did not have constructive or actual knowledge of a potential claim against Arthur Young arising from the 1980 audit until early 1983. BNO also asserted that it was seeking to hold Arthur Young liable *in solido* with Monco and Montagnet, and that timely suit against those defendants interrupted prescription as to Arthur Young. The district court agreed with Arthur Young that BNO had constructive knowledge of a potential negligence claim before August 10, 1982. The court also held that prescription was not interrupted on the basis of *in solido* liability.

## II.

BNO makes the two arguments on appeal which it urged before the district court: 1) since it seeks to hold Arthur Young liable *in solido* with other defendants who were timely sued, prescription was interrupted; and 2) it did not have actual or constructive knowledge of a potential claim against Arthur Young until after August 10, 1982.

Arthur Young raises three arguments against interrupting prescription on the basis of *in solido* liability. First, Arthur Young contends that the August 1983 prescription agreement between BNO and Arthur Young precludes a finding of interruption on the basis of BNO's timely July 1982 suit since BNO expressly agreed to deem

August 10, 1983 as the filing date. Second, Arthur Young contends BNO's position that timely suit against alleged solidary obligors interrupted prescription was not properly raised in the pleadings in the district court. And third, Arthur Young claims that solidary liability is not available as a matter of law in this case.

### A.

■ The August 1983 prescription agreement provides in pertinent part:

> In consideration of foregoing the filing of suit at this time by the Bank of New Orleans and Trust Company, Arthur Young & Company agrees to treat any action brought by or on behalf of the Bank of New Orleans and Trust Company or its successor in interest, First National Bank of Commerce, in connection with Arthur Young & Company's audit of and report on the consolidated financial statements of Monco Agency, Inc. for the period ended December 31, 1980, as having been brought as of August 10, 1983. . . .

Arthur Young argues that the wording of this agreement is unambiguous, that any suit brought by BNO in connection with Arthur Young's 1980 audit of Monco would be treated "as having been brought as of August 10, 1983." Arthur Young contends that this agreement supercedes BNO's attempt to append an exception that prescription was interrupted by the filing of an earlier, timely suit against solidary obligors. Arthur Young further submits that Louisiana law supports the enforcement of parties' agreements concerning prescription. *See, e.g., McDermott, Inc. v. M-Electric & Construction Co.,* 496 So.2d 1105, 1111–12 (La.Ct.App.1986) (upholding agreement shortening the applicable prescriptive period).

Arthur Young's reliance on Louisiana case law in this instance is unavailing. The agreement in the case at bar does not identify the applicable prescriptive period. The agreement merely stipulates the date at

---

**3.** Article 3492 provides that "[d]elictual actions are subject to a liberative prescription of one year. This prescription commences to run from the day injury or damage is sustained." The concept of delictual liability under Louisiana law includes negligence.

which a lawsuit brought by BNO against Arthur Young in connection with its 1980 audit would be deemed filed. When BNO added Arthur Young as a defendant to its lawsuit against Monco and Montagnet in May 1984, the agreement treated the addition as if it had been made on August 10, 1983. That is the entire sum and substance of the agreement. It does not discuss or consider the effect of the earlier, timely lawsuit alleging fraud on the part of Monco and Montagnet. It does not purport to restrict BNO's ability to allege Arthur Young's *in solido* liability with these defendants.

### B.

Arthur Young contends that BNO is precluded from asserting its solidary liability interruption theory because it did not plead it before the district court. In particular, Arthur Young claims that the one-year statute of limitations with respect to BNO's negligence claim had run on its face, since the alleged negligent audit took place in 1980 and the complaint was not filed until August 1983. To overcome this patent deficiency in pleading, Arthur Young asserts, BNO was required to allege with specificity its position that prescription was interrupted by the timely June 1982 filing.

BNO did, in fact, plead Arthur Young's solidary liability in the third amended complaint's prayer for relief:

> WHEREFORE, plaintiff, The Bank of New Orleans and Trust Company, prays:
>
> (A) For judgment ... in favor of plaintiff, First National Bank of Commerce, and against defendants, [Monco, Montagnet and others] and Arthur Young and Company, *jointly, severally, and in solido* rescinding plaintiff's purchase of securities alleged herein and awarding plaintiff, on account of said recission [sic], the sum of $2,158,111.10.... [emphasis added]

BNO repeated this allegation of solidary liability in the following paragraph (B), stating an alternative theory of recovery.

Arthur Young submits that this pleading is deficient since a prayer for relief is not a part of the cause of action itself and does not supplement the facts alleged in the body of the complaint. *See, e.g., WICO Corp. v. Willis Industries,* 567 F.Supp. 352, 355 (N.D.Ill.1983). This is wrong on two counts. First, the Federal Rules of Civil Procedure are based on the concept of "notice pleadings." *See* Wright & Miller, 5 Federal Practice and Procedure: Civil § 1202 (1969). Technicalities and pleading niceties give way to substance. Fed.R. Civ.P. 1 and 8(a). Second, Arthur Young's position ignores the fact that BNO's prayer for relief is a product of the facts alleged in preceding paragraphs. The omission of the words "solidary liability" in the part of the complaint which addressed Arthur Young's role in BNO's extension of credit to Monco and the resulting monetary loss did not detract from the overall thrust of the allegations. The facts alleged in the body of the complaint combined with the specific allegation of solidary liability in the prayer for relief were sufficient to put the court and Arthur Young on notice that BNO was seeking to hold Arthur Young liable *in solido* with Monco and Montagnet.

If BNO had failed to expressly plead its prescription interruption theory in specific terms in the third amended complaint it would not be precluded from asserting its claim before the district court. Arthur Young relies on *Mann v. Adams Realty Co.,* 556 F.2d 288 (5th Cir.1977), for the proposition that a complaint fails to state a claim upon which relief can be granted if it shows on its face that prescription has run. *Mann* recognizes that a Rule 12(b)(6) motion to dismiss for failure to state a claim, *see* Fed.R.Civ.P. 12(b)(6), is an appropriate method for raising the affirmative defense of prescription. *Mann,* 556 F.2d at 293. This case, however, does not present a Rule 12(b)(6) issue. Arthur Young did not even move for a Rule 12(b)(6) dismissal.[4] If it

---

4. Arthur Young did move for dismissal on jurisdictional grounds. Arthur Young also immediately raised a prescription defense, moving for

summary judgment and/or judgment on the pleadings. Under Fed.R.Civ.P. 12(c), a motion for judgment on the pleadings is treated as a

had, the parties could have addressed the prescription issue in that context. However, the factual issue as to when BNO had constructive knowledge of a potential claim against Arthur Young was not one that could be readily resolved at that stage of the proceedings. Indeed, this very issue was contested through the discovery process for over two years before the district court's summary judgment in favor of Arthur Young. No procedural impediment precluded the district court from further considering BNO's alternative argument—which BNO asserted in memoranda submitted in response to Arthur Young's motion for summary judgment—that prescription was interrupted on the basis of the earlier, timely suit filed against Arthur Young's alleged solidary obligors. The issue of interruption was expressly raised, the parties briefed and argued the issue before the district court, and that court decided the matter on the merits. The issue was properly raised below and preserved for review on appeal.

Alternatively, Arthur Young contends that BNO did not satisfy its burden under Fed.R.Civ.P. 56 of submitting evidence with respect to Arthur Young's concurrent fault and solidary liability at the summary judgment stage. Arthur Young submits that BNO was required to go "beyond the pleadings and ... designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Rule 56(e)).

■ Whether Arthur Young is liable *in solido* with the other defendants for BNO's loss is the ultimate issue in this case, and in the district court BNO must prove that Arthur Young's negligence played a part in causing its loss on the Monco loan. The focus of Arthur Young's summary judg-

ment motion, however, was not factual liability. Arthur Young did not submit or argue facts which showed that it did not conduct the audit in question or that BNO did not rely on the audit in extending the loan. Arthur Young asserted instead that BNO's claim was prescribed on the basis of BNO's constructive knowledge of a potential claim before August 1982. BNO's position that prescription was interrupted was raised in response to Arthur Young's affirmative defense that the statute of limitations had run and was based on factual assertions in pleadings and memoranda.

BNO did not fail to sustain its summary judgment burden. It properly raised the argument that prescription was interrupted on the basis of the earlier, timely suit against Monco and Montagnet as alleged solidary obligors. Arthur Young argues, however, that BNO has failed to show a "relationship between Arthur Young and BNO" or the falsity of Arthur Young's representations in the 1980 audit. These assertions that BNO must prove solidary liability at the summary judgment stage erroneously would impose a burden on BNO to prove its negligence case before trial.

### C.

BNO's challenge to the district court's holding that prescription was not interrupted claims that both Arthur Young and the defendants sued in July 1982 are liable to BNO for the same loss on the Monco loan and thus are liable *in solido.*

Arthur Young does not dispute the fact that the filing of suit against a solidary obligor interrupts prescription with regard to all other solidary obligors. *See* La.Civ. Code Ann. art. 2097, revised as La.Civ.Code Ann. art. 1799 (West Supp.1987).[5] Rather,

---

summary judgment motion under Fed.R.Civ.P. 56.

**5.** Article 2097 provided:
   A suit brought against one of the debtors in solido interrupts prescription with regard to all.
   La.Civ.Code Ann. art. 2097. This article was in effect at the time BNO first brought suit against Monco and Montagnet as well as when it sought

to join Arthur Young to that suit. Art. 2097 has since been revised:
   ·The interruption of prescription against one solidary obligor is effective against all solidary obligors and their heirs.
   La.Civ.Code Ann. art. 1799 (West Supp.1987). Art. 1799 expands the old art. 2097 to give interruptive effect to acts other than the filing of suit. Suit was filed here, so the articles do not differ materially for our purposes.

Arthur Young simply argues that it cannot be held solidarily liable as a matter of law.

Article 2324 of the Civil Code provides that "[p]ersons whose concurring fault has caused injury, death or loss to another are also answerable, *in solido*." La.Civ.Code Ann. art. 2324 (West Supp.1987). In addition, article 2091, in effect at the time in question, provided "[t]here is an obligation *in solido* on the part of the debtors, when they are all obliged to the same thing, so that each may be compelled for the whole...." La.Civ.Code Ann. art. 2091.[6]

■ BNO's allegations before the district court satisfy either definition of solidary liability provided in the Civil Code. BNO alleged that Monco and Montagnet made false statements or omissions of material fact concerning the financial condition of Monco and CBIC in connection with loan negotiations in 1981 between Monco and BNO. In May of 1981, Arthur Young issued the audit report for the fiscal year ending December 31, 1980. BNO alleged that, had Arthur Young properly audited Monco and CBIC and issued financial statements reflecting the true financial condition of Monco and CBIC, the misstatements in Monco's in-house reports the following year could not have occurred; that Monco and Montagnet used the erroneous audit report to misrepresent Monco's and CBIC's financial condition in 1981; that it relied both on Arthur Young's report and the ensuing in-house reports, which combined to cause BNO's loss of over $2.1 million.

BNO asserts that the "concurring fault" of Monco, Montagnet, and Arthur Young caused this loss. All defendants are liable to BNO for the "same thing"—BNO's loss as a result of the Monco loan. Under BNO's theory of the case, all defendants are solidary obligors. Full performance by one solidary obligor here would relieve the others of liability to BNO. *See Billiot v. American Hospital Supply Corp.*, 721 F.2d 512, 513–14 (5th Cir.1983) (applying articles 2324 and 2091, court finds that negligent physician and manufacturer of defectively designed product may be deemed solidary obligors for purposes of interrupting prescription).

Arthur Young counters that BNO's claims against Monco and Montagnet were based on federal and state securities laws and that BNO's claim against Arthur Young, conversely, is grounded on negligence under the Civil Code. Arthur Young contends that since federal law governs BNO's federal securities claims, there can be no solidary obligation under Louisiana law. Similarly, Arthur Young urges that Louisiana's Blue Sky statute is not a part of the Civil Code and that therefore the general solidary obligor provisions in the Civil Code do not encompass securities law violations. Arthur Young further reads the Louisiana Blue Sky statute, *see* La.Rev.Stat.Ann. § 51.714 (West Supp.1987)[7] as limiting the class of wrongdoers who may be held liable for state securities violations.

Arthur Young has cited no authority for its position that BNO was required to sue the initial defendants under the Civil Code in order to interrupt prescription as to the negligence claim against it. There is no basis in logic or law for requiring that the source of liability be found in the Civil Code and sued upon pursuant to a specific codal authority before such liability may be deemed joint, several, or *in solido* with that of others. Indeed, La.Civ.Code Ann. art. 1797 (West 1987) provides: "An obli-

---

6. Old article 2091 is now revised as new article 1794:
    An obligation is solidary for the obligors when each obligor is liable for the whole performance. A performance rendered by one of the solidary obligors relieves the others of liability toward the obligee.
    La.Civ.Code Ann. art. 1794 (West Supp.1987). The revision does not change the law.

7. Section 51.714 is a revision of old § 51.715, which was in effect at the time BNO sued Arthur Young. Section 51:715 provided:

    B. Every person who directly or indirectly controls a seller liable under Subsection (A), every partner, officer, or director of such a seller, every person occupying a similar status or performing similar functions, every employee of such a seller who materially aids in the sale, and every broker-dealer or agent who materially aids in the sale are also liable jointly and severally with and to the same extent as the seller....

gation may be solidary though it derives from a different source for each obligor." Moreover, the Louisiana Blue Sky Law does not exclude categories of persons as potential solidary obligors; rather, it provides that persons such as "general partners," and "officers" who control the defendant seller shall be "jointly and severally" liable. The Blue Sky Law merely provides a statutory cause of action for securities fraud. It does not effect the character of that fraud for purposes of classification under the Louisiana Civil Code.

Arthur Young contends that Monco and Montagnet and Arthur Young are not "obligated to the same thing." Arthur Young submits that Monco and Montagnet were sued for rescission—in other words, to void the contract and recover the money BNO loaned to Monco in exchange for pledged CBIC stock—while Arthur Young was sued for mere negligence in preparing the 1980 audit. Arthur Young claims that since it was not a party to the loan transaction it could never be held liable for rescission, to void the Monco loan contract, or to return the consideration paid for the CBIC stock. Arthur Young misses the point. One thing BNO seeks is to recover damages sustained as a result of the Monco loan default. While different theories of recovery are asserted as to Monco and Montagnet, all defendants are allegedly obligated to the same thing insofar as recovery of the loan loss is concerned. Recovery of the loan loss damages against either Monco and Montagnet or Arthur Young under any theory would satisfy this common demand as to all defendants.

Arthur Young contends that solidary liability is not applicable because Monco and Montagnet were sued for fraud and Arthur Young was not. There is no impediment to holding one fraudulent defendant and one "merely" negligent defendant liable *in solido* when their concurrent fault has caused a single loss if they are obligated for the same thing. As this court observed in *Equilease Corp. v. Smith International, Inc.,* 588 F.2d 919, 929 (5th Cir.1979):

> Logically, a party may be held individually liable for negligence whether the damage caused to the plaintiff takes the form of fraud or bodily injury. And we perceive no impediment to binding a defendant who acts negligently *in solido* with those who commit an intentional tort when the same harm to the plaintiff results, provided, of course, that each party is legally at fault.

Here the same harm to BNO has resulted from BNO's asserted intentional fraud on the part of Monco and Montagnet and negligent accounting practices on the part of Arthur Young.

Arthur Young relies on the Louisiana Third Circuit's recent decision in *Bertrand v. St. Paul Fire and Marine Ins. Co.,* 491 So.2d 474 (La.App. 3d Cir.), *cert. denied,* 494 So.2d 541, 543 (La.1986), in which the court rejected interruption of prescription of an action against an alleged solidary obligor in circumstances Arthur Young says are analogous to those in its case. In *Bertrand,* an action was brought to enjoin a hospital and physicians from destroying evidence surrounding the death of a patient. Following the date on which a medical malpractice action would have prescribed, the original complaint was amended to include malpractice claims against the original defendants and one additional physician, who was named for the first time. The state appellate court held that the amendment related back and thus exempted the plaintiff's claims against the originally named defendants from prescription; however, the court also held that the amendment did not relate back with respect to the physician named for the first time. The court rejected the argument that prescription was interrupted by the original action seeking injunctive relief against the physician's alleged solidary obligors.

Arthur Young submits that the Louisiana court refused to allow interruption as to this physician because "there was no pleading filed putting him on notice that some form of judicial relief was being sought arising from his participation in the events surrounding Bertrand's death, and putting him on notice that his evidence concerning it should be collected and preserved." *Id.* at 481. By analogy, Arthur

Young contends that the fraud claims against Monco and Montagnet could not have put it on notice of a possible negligence action against it in regard to the 1980 audit.

Arthur Young's reliance on *Bertrand* to define sufficient notice with respect to Louisiana prescription is misplaced. *Bertrand* determined that the amendment adding a malpractice claim did not relate back so as to permit the claim against the newly named defendant. Solidary liability was not the issue. The Louisiana court refused to interrupt prescription because article 2097 required a timely *suit* against a solidary obligor to interrupt prescription as to another. In *Bertrand*, there never was a timely malpractice suit. The untimely malpractice amendment could not relate back to the earlier filed injunction action. The relief being sought in the initial action—preservation of evidence—did not demand the same thing—damages stemming from a patient's death due to medical malpractice. Arthur Young, on the other hand, knew or could have known from the date of the initial action that BNO was seeking to recover its loss on the Monco loan. Timely suit against an alleged solidary obligor which was jointly liable for that loss put Arthur Young "on notice" for purposes of interrupting prescription.

Arthur Young contends that its fault was not concurrent with that of Monco and Montagnet. Arthur Young asserts that fraudulent and negligent acts can never be concurrent under article 2324 of the Louisiana Civil Code. Article 3556 of the Louisiana Civil Code states that there are three degrees of fault: the gross, the slight, and the very slight. "The *gross* fault is that which proceeds from inexcusable negligence or ignorance; it is considered as nearly equal to fraud." La.Civ.Code Ann. art. 3556. To equate fraud with negligence is to ignore these defined degrees of fault. This truism is immaterial in the present setting.

Article 2324 speaks of "concurring fault." It does not consider degrees of fault. Under this court's reasoning in

*Equilease* fraud can concur with negligence:

In Louisiana, the basis of all delictual recovery is fault. The notion of fault encompasses, besides the doing of an unlawful act, both the intentional harming of another (*dolus*) and the negligent harming of another (*culpa*). *See* Stone, *Tort Doctrine in Louisiana: The Concept of Fault*, 27 Tul.L.Rev. 1, 8–13 (1952).

True, imposing solidary liability on codelinquents, when one has committed a willful harm and the other a negligent one, may lead to inequitable results if there is no apportionment of fault between the defendants. The one who is negligent is rarely equally at fault with the one who intends to harm. But the same inequity results when one tortfeasor is grossly negligent and the other is only slightly negligent. The remedy lies in regulating contribution rather than limiting the ambit of Article 2324.

588 F.2d at 929 n. 12. Similarly, we hold that article 2324 encompasses both fault that takes the form of willful harm and negligence. *See Billiot*, 721 F.2d at 513–14 (combining negligence and product liability is to the same effect).

Finally, Arthur Young makes reference to the ground on which the district court apparently determined that Arthur Young and the other defendants could not be solidary obligors: because Arthur Young could not be liable to Monco and Montagnet for contribution under the federal securities laws as joint tortfeasors. Again, Arthur Young advances a correct statement of the law which has no applicability to the present issue. Monco and Montagnet as intentional tortfeasors could not seek contribution from Arthur Young as a negligent party. However, the determinative inquiry under the Louisiana Civil Code is not the right to contribution, but whether the concurring fault of all three defendants caused BNO's loss and whether all defendants are obligated to the same thing. Arthur Young is clearly not liable for the alleged fraud, but BNO is not precluded from seeking to hold it responsible *in solido* for its role in conducting the allegedly

improper audit which enabled Montagnet and Monco to perpetrate that fraud and allegedly concurred to cause BNO's loss.

### III.

BNO has properly alleged that Arthur Young is liable *in solido* for its negligence in connection with the 1980 audit and representations of Monco's and CBIC's financial condition. The timely June 1982 suit against alleged solidary obligors Monco and Montagnet thus interrupted prescription with regard to Arthur Young. We hold only that prescription was interrupted as a matter of law. We express no opinion as to whether BNO had constructive knowledge of a potential claim against Arthur Young before August 10, 1983. Obviously, we express no view on the merits of the claims asserted. The district court's judgment dismissing BNO's claim against Arthur Young is

REVERSED AND REMANDED.

**Alton J. HOUSTON, Plaintiff-Appellee, Cross-Appellant,**

v.

**UNITED STATES POSTAL SERVICE, et al., Defendants-Appellants, Cross-Appellees.**

No. 85–3639.

United States Court of Appeals, Fifth Circuit.

Aug. 13, 1987.

Rehearing and Rehearing En Banc Denied Sept. 23, 1987.

Before WISDOM, JOHNSON and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

The question in this Federal Tort Claims Act case is whether the district court had jurisdiction to try Alton Houston's suit against the United States. We hold that the lower court lacked jurisdiction and accordingly reverse the judgment below and dismiss the case.

### Facts and Proceedings Below

When the events giving rise to this suit occurred, Alton Houston was a laborer for the New Orleans Sewerage and Water Board. On January 27, 1976, he was sitting in a large city truck parked in a crowded New Orleans street when a United States Postal Service (USPS) van, clearly marked as such, collided with the mirror of the city truck. Except for the shattered mirror, the truck was not damaged.

According to Houston, this impact caused him a variety of injuries, including back problems and alcohol dependency. These injuries reduced his earning potential. The district court found in Houston's favor and held the United States liable for $121,887.20.

The procedural history of the case is quite important. On January 27, 1977, one year after the collision, Houston sued the United States; Joseph Howard, the driver of the postal van; and the USPS in Louisiana court. Pursuant to his direction, process was not issued or served.

Just under two years after the accident, on January 17, 1978, Houston filed an administrative claim with the USPS. As we will explain, the filing of such an administrative claim within two years after its accrual was required by the Federal Tort Claims Act (FTCA) (codified at 28 U.S.C. §§ 1346(b), 1402(b), 1504, 2110, 2401, 2402, 2411, 2412, 2671–2680). About three months after this claim was filed, the USPS notified Houston's attorney of its denial. That notification letter, dated April 26, 1978, stated, "[I]f your client is dissatisfied with the final action on his clain [*sic*], he may file suit in an appropriate United

Nancy A. Nungesser, Asst. U.S. Atty., New Orleans, La., Joan Bernott, Washington, D.C., Boggs, Loehn & Rodrigue, New Orleans, La., for U.S. Postal Service.

Adolph J. Levy, Thomas A. Gennusa, II, New Orleans, La., for Houston.

States District Court *not later than six months from the date of this letter."* (Emphasis added.) The six-month limitations period explained in the letter is codified at 28 U.S.C. § 2401(b). Houston's counsel stated during oral argument in this court that the denial letter was not "diaried" on a "prescription card" at his law firm. Because of this oversight, it was not until April 23, 1980, *almost two years after the administrative denial,* that Houston for the first time caused process in his Louisiana court suit to be served on the defendants therein.

After being served, the United States removed the case to federal court, as authorized by 28 U.S.C. §§ 1441(a) and 1442(a)(1). (For some reason, the United States did not rely on the FTCA removal statute—28 U.S.C. § 2679(d).) The USPS and the United States moved to dismiss the case on grounds that the United States was the only proper defendant and Houston had not sued it within six months of the administrative denial of his claim.

The district court dismissed the USPS (and Howard), but denied the dismissal motion as to the United States. In a thorough opinion, the court reasoned that Houston's state court suit sufficed as timely compliance with the limitations requirement of the FTCA. Because the district court considered the state suit sufficient under the FTCA, it did not view Houston's long delay in serving process as a jurisdictional defect. After a bench trial that covered portions of three days, the court rendered judgment for Houston.

The United States appeals the judgment, asserting that the district court lacked jurisdiction to try the case due to Houston's alleged noncompliance with the FTCA limitations period. Houston cross-appeals, complaining that the district court's $25,-000 award for pain and suffering is too low.

**Discussion**

Essentially, this case raises only two questions: (1) whether the FTCA's procedural requisites apply to a tort claim arising out of a collision with a government vehicle; and, (2) if the FTCA's procedural requirements apply, whether Houston complied with them. We answer "yes" to the first question and "no" to the second.

I.

■ "The United States, as sovereign, is immune from suit save as it consents to be sued . . . ." *United States v. Sherwood,* 312 U.S. 584, 61 S.Ct. 767, 769, 85 L.Ed. 1058 (1941). In construing waivers of sovereign immunity, courts are not free to extend or narrow the waiver beyond what Congress intended. *United States v. Kubrick,* 444 U.S. 111, 100 S.Ct. 352, 357, 62 L.Ed.2d 259 (1979). These familiar axioms undergird our analysis.

In various statutes through the years, Congress has carved into the immunity of the federal government. *See generally* Hulen, *Suits on Tort Claims Against the United States,* 7 F.R.D. 689, 689–90 (1948) (discussing, *inter alia,* the Tucker Act); Comment, *Administrative Claims and the Substitution of the United States as Defendant Under the Federal Drivers Act: The Catch 22 of the Federal Tort Claims Act?,* 29 Emory L.J. 755, 758 (1980) (citing several statutory examples of sovereign immunity waiver). An important such waiver occurred in 1946, when Congress passed the FTCA. *See* Hulen, 7 F.R.D. 689 (explaining the original version of the FTCA). The FTCA provides that the United States is liable for damages "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 2675(a).[1]

---

1. The Postal Reorganization Act of 1970, codified as Title 39 of the United States Code, waives sovereign immunity "with respect to the Postal Service." *Franchise Tax Bd. of Calif. v. U.S. Postal Service,* 467 U.S. 512, 104 S.Ct. 2549, 2553, 81 L.Ed.2d 446 (1984) (footnote omitted). Section 409(c) of Title 39 states that "[t]he provi-

sions of chapter 171 [the FTCA] and all other provisions of title 28 relating to tort claims shall apply to tort claims arising out of activites of the Postal Service."

In conditioning the waiver of immunity for the USPS on the provisions of the FTCA, the Congress ensured that "[a]ny tort claim against

The FTCA as originally enacted did not abolish the plaintiff's action against the negligent government employee. The plaintiff could "sue the employee by asserting his common law right against the tortfeasor or go against the government on the basis of *respondeat superior.*" Note, *The Constitutionality and Basic Fairness of the Government Drivers Law,* 54 Minn.L. Rev. 645, 651–52 (1970) (footnotes omitted); *see also* Murdock, *The Federal Government as an Insured Under an Employee's Auto Insurance Policy,* 36 Mil.L.Rev. 91, 94 (April 1967) (noting that under the original FTCA the "plaintiff could always choose to ignore the FTCA remedy and sue the employee in an appropriate state court"); Comment, 29 Emory L.J. at 755 (1980) (same). Some government employees succeeded in procuring indemnification from the government through passage of private relief bills. S.Rep. No. 736, 87th Cong., 1st Sess., *reprinted in* 1961 U.S. Code Cong. & Ad. News 2784, 2794; Stevens, *Scope of Employment and the Government Motor Vehicle Operator,* JAG L.Rev. 13, 14 (Jan.-Feb. 1966). This procedure was expensive and time-consuming, and not all employees pursued it. In response to the problem, Congress in 1961 amended the FTCA by adding four subsections to 28 U.S.C. § 2679. Act approved September 21, 1961, Pub.L. No. 87–258, 75 Stat. 539 (1961). The amendment, known as the Federal Drivers Act (FDA), deprived plaintiffs whose injuries arose from the negligent operation of a government vehicle of any claim against the driver in his individual capacity. "The remedy *by suit* against the United States as provided by [28 U.S.C.] section 1346(b) ... shall hereafter be exclusive of any other civil action or proceeding ...." Section 2679(b) (1961 version) (emphasis added). The design and effect of the FDA was to relieve government drivers "from the hazard of personal liability stemming from driving motor ve-

hicles in the course of official duty." L. Jayson, *Handling Federal Tort Claims* § 175.03[1], at 6–17 and 6–18.4 (1986) (footnote citing cases omitted).

In 1966, Congress again extensively amended the FTCA. Act approved July 18, 1966, Pub.L. No. 89–506, 80 Stat. 306 (1966). The amendments imposed a requirement that all tort claimants seek administrative relief before turning to the courts. *See* 28 U.S.C. §§ 2401(b), 2675(a). Congress was motivated by a desire to reduce congestion in the courts and by statistics showing that most claims against the government were settled, thus suggesting that an administrative scheme could be very effective. S.Rep. No. 1327, 89th Cong., 2d Sess., *reprinted in* 1966 U.S. Code Cong. & Ad.News 2515, 2516–18; *Rise v. United States,* 630 F.2d 1068, 1071 (5th Cir.1980) (recognizing these as the reasons for the administrative exhaustion requirement); Comment, 29 Emory L.J. at 766. The FDA, subsumed in section 2679(b)-(d) of the FTCA, which had previously referred to the plaintiff's exclusive remedy "by suit" was changed to read, "The remedy against the United States provided by sections 1346(b) *and 2672 of this title* ... shall hereafter be exclusive ...." Section 2679(b) (emphasis added). Congress' substitution of the administrative remedies provision, section 2672, for the phrase "by suit" strongly suggests that Congress intended FDA cases to begin with an administrative claim, not a lawsuit. This interpretation is borne out by the legislative history, which states that this change in the FDA was designed to "make it conform" with the administrative exhaustion requirement. S.Rep. No. 1327, 89th Cong., 2d Sess., *reprinted in* 1966 U.S. Code Cong. & Ad.News 2515, 2521.

Houston argues that the amendment adds an administrative claim as a possible remedy, without eliminating the remedy by suit.[2] Admittedly, Congress could have

the USPS must be cognizable under the FTCA." *McCollum v. Bolger,* 794 F.2d 602, 608 (11th Cir.1986) (per Wisdom, J.), *cert. denied,* —— U.S. ——, 107 S.Ct. 883, 93 L.Ed.2d 836 (1987); *see Insurance Co. of N. America v. United States Postal Service,* 675 F.2d 756, 758 (5th Cir.1982).

Section 409(c) incorporates the FTCA, but it does not enlarge or diminish the terms of the FTCA.

**2.** Section 2679(b)-(d) obviously contemplates that lawsuits can be *filed* in state court against the individual, for a removal mechanism is pro-

made the matter clearer by incorporating section 2675(a) within the FDA. Section 2675(a) says, "An action shall not be instituted" until the administrative claim is denied. *See* Comment, 29 Emory L.J. at 782 (discussing this ambiguity in section 2679(b)). But the interpretation suggested by Houston underestimates Congress' *deletion* of the phrase "by suit" from section 2679(b) and, more importantly, Houston's interpretation would undermine the goals of efficient administrative settlement and reduced congestion in the courts that Congress sought to achieve by the 1966 amendments.

■ Finally, it would not be logical to assume that Congress imposed an administrative exhaustion requirement for all tort claims against the United States, except for claims arising from collisions with government vehicles. We see no distinction between the two types of claims, and nothing in the FTCA or its legislative history suggests that Congress did either. In sum, the statute's organization and language, considered in light of the problems that Congress sought to correct with the 1961 and 1966 amendments, lead us to conclude that FDA claims are subject to the administrative exhaustion requirements and limitations periods of the FTCA.

Our interpretation is consistent with the majority of cases discussing the FTCA in its post–1966 era. *See, e.g., Henderson v. United States,* 785 F.2d 121, 123 (4th Cir. 1986) (dismissing claim arising from collision with USPS vehicle for failure to file administrative claim within section 2401(b) limitations period); *Rogers v. United States,* 675 F.2d 123, 124 (6th Cir.1982) (same); *Bialowas v. United States,* 443 F.2d 1047, 1049 (3d Cir.1971) (same); *Meeker v. United States,* 435 F.2d 1219, 1222 (8th Cir.1970) (same); *Wilkinson v. United States,* 677 F.2d 998, 1000 (4th Cir.) (affirming dismissal of claim arising from collision

with automobile driven by a serviceman while on duty because claimant failed to seek administrative relief), *cert. denied,* 459 U.S. 906, 103 S.Ct. 209, 74 L.Ed.2d 167 (1982); *Wollman v. Gross,* 637 F.2d 544 (8th Cir.1980) (affirming dismissal of claim arising from collision with automobile driven by employee of the Agricultural Stabilization and Conservation Service because plaintiff's claim for administrative relief was untimely), *cert. denied,* 454 U.S. 893, 102 S.Ct. 389, 70 L.Ed.2d 207 (1981); *United States v. LePatourel,* 571 F.2d 405, 410 (8th Cir.1978) (reversing district court's refusal to dismiss claim arising from collision with vehicle driven by a federal judge because claimant failed to seek administrative relief), *modified to apply prospectively,* 593 F.2d 827 (8th Cir.1979) (en banc); *cf. Miller v. United States,* 741 F.2d 148, 150 (7th Cir.1984) (reversing the dismissal of claim arising from collision with USPS vehicle because within six months of the administrative denial state court suit against individual was filed and removed to federal court, thus timely making the United States a proper party); *McGowan v. Williams,* 623 F.2d 1239, 1242–43 (7th Cir. 1980) (reversing dismissal of claim because state suit against the individual, filed after administrative denial, met the FTCA's requirements even though case was not removed to federal court until after the limitations period expired).

Two cases—one from the Second Circuit, the other from the Ninth—are out of step with the majority view because they hold that a plaintiff can avoid the FTCA's procedural requirements by filing suit against the government driver in state court. *Staple v. United States,* 740 F.2d 766, 768 (9th Cir.1984); *Kelley v. United States,* 568 F.2d 259, 266 (2d Cir.), *cert. denied,* 439 U.S. 830, 99 S.Ct. 106, 58 L.Ed.2d 124 (1978); *see* L. Jayson, *supra,* § 175.03[2] at 6–27 (describing *Kelley* as the "minority

---

vided. But the fact that a claim can be filed does not mean that it can proceed to adjudication on the merits without first being presented for administrative consideration. The most obvious reason to permit suits to be filed against the driver is to toll the state limitations period so that plaintiff preserves his claim against the

negligent driver in the event it is later determined that the driver was not acting within the scope of his employment. *See McGowan v. Williams,* 623 F.2d 1239, 1242 (7th Cir.1980); 28 U.S.C. § 2679(d) (providing for remand to state court in such a case).